Eddie **BLOW**, Plaintiff, Appellee,

v.

**COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S.A.**, Defendant and Third-Party Plaintiff, Appellant,

v.

**OLD DOMINION STEVEDORING CORPORATION**, Third-Party Defendant, Appellee.

No. 11186.

United States Court of Appeals Fourth Circuit.

Argued May 5, 1967.

Decided May 7, 1968.

Harry E. McCoy, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellant.

Sidney H. Kelsey, Norfolk, Va. (Kelsey & Rabinowitz, Norfolk, Va., on brief), for appellee Eddie Blow.

Bernard G. Barrow and Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellee Old Dominion Stevedoring Corporation.

Before HAYNSWORTH, Chief Judge, and BOREMAN and WINTER, Circuit Judges.

BOREMAN, Circuit Judge:

Defendant, Compagnie Maritime Belge, a shipowner, appeals from a judgment upon a verdict which was directed by the district court against it as to its liability to plaintiff, Blow, and from a judgment upon a jury verdict adverse to the shipowner in its third-party action for indemnity against Old Dominion Stevedoring Corporation. We find no error and affirm the court below.

Plaintiff, Blow, is a longshoreman employed by the stevedore, Old Dominion, which in turn had been employed by the shipowner to load cargo onto one of its vessels, the S. S. TENIERS. The cargo consisted of large rolls of liner-board which were being lifted onto the ship two at a time by two wire slings. The slings were attached to the ship's cargo-hook which was secured to the cargo-falls. The ship's winches set the entire process in operation. The slings were 30 feet in length, with an eye in each end so that they could be placed under the cargo. The eyes were attached to the cargo-hook. When the empty slings were coming out of the hatch they hung fifteen feet below the cargo-hook and it was normal for them to swing about.

On December 12, 1965, Blow was assigned to No. 3 lower 'tween-deck to load the cargo. The gang consisted of nine men in the hold, including Blow, a signalman on deck, two winch operators at the controls and several men on the dock.

The gang commenced the loading operation at about 8:00 A.M., and the accident occurred at approximately 11:50 A.M., when Blow was hit with a steel door which fell from the upper 'tween-deck. The door was an outer protective door on the entrance to a refrigerated area on the upper 'tween-deck. The hinges of the door were merely two upright pins on which the door was hung. The accident occurred when the empty wire sling, which was swaying back and forth and was being lifted through the hatch, caught on the door. Pulled upward and lifted off its pins or hinges, the door fell below, struck a pile of dunnage and then bounced into plaintiff as he was attempting to reach a place of safety.

The winches which lowered and raised the slings were operated by employees of the stevedore and all directions incident to the loading operation were issued by the stevedore's employees. The crew of the ship was not participating in the operation and neither retained nor exercised any control over it.

Several witnesses testified concerning the accident. Walter Mitchell, an employee of Old Dominion, was working in the 'tween-deck all morning on the day of the accident. He testified that he had seen members of the ship's crew going in and out of the refrigerator door and that they were leaving the door open and extending out over the hatch coaming. Mitchell said that just prior to the accident he had seen members of the ship's crew going in and out of the door and that he had noticed that as the slings left the hatch they were swinging although he could not state how close they had come to the door. Mitchell also stated that he saw the accident occur when the sling being raised through the hatch hit the door. He saw the door tumbling and called out a warning to Blow. According to Mitchell, Blow tried to run but the door bounced after it hit and struck him.

Cornelius Williams, Old Dominion's employee, who was also working in the hold, testified that he had observed members of the ship's crew using the refrigerator door just prior to the accident. However, he stated that he did not see any member of the crew in the vicinity of the door at the time of the accident.

Joseph Holloman, the hatch foreman and also an employee of Old Dominion, testified that he had observed the door open for fifteen to twenty minutes prior to leaving the hold and that the door was extending over the hatch coaming a distance of something like eighteen inches to two feet. He was not in the hatch at the time of the accident but was on deck, having left the hatch about five minutes earlier. Holloman stated that he was responsible for the proper handling of cargo and it was his duty to check and report the presence of any dangerous conditions aboard the ship.

Finally there is the testimony of Vernon Hartman, employed by Old Dominion as foreman. He testified that he had authority to ask the shipowner, or the members of the crew, to close the door. He stated that he had noticed the door open but that it did not interfere with working conditions. When he observed the door it was "folded back" against the reefer bulkhead and was "[s]ecured with rope string; rope yarn we call it, just a piece of yarn off a great big piece of Manila rope." He admitted that he left the hatch and went to the dock about five minutes before the accident occurred; while he did not observe the door at that time it had been open and tied back to the bulkhead all morning every time he looked.

On motion of the plaintiff the district court directed a verdict in his favor and against the shipowner on the basis of unseaworthiness. During a discussion between the court and counsel prior to granting plaintiff's motion, the court and counsel made certain statements, pertinent portions of which are set out in the margin.[1]

[1] THE COURT: Now, let's assume—of course, Mr. Hartman did not testify that at the particular time of the accident that the reefer doors were folded back against the bulkhead, but let's assume that you can gather that as an inference. That is certainly the best that you could establish. Nevertheless, the stevedore himself, of course, can create the unseaworthy condition—[interruption].

THE COURT, continuing—and in this situation, it just seems to me as though this case is a legitimate controversy between the third-party plaintiff and third-party defendant. There can be no question about the fact that these reefer doors, no matter where they were, were not reasonably intended to be lifted off their hooks and deposited in the lower 'tween-deck—

SHIPOWNER'S COUNSEL: Yes, sir, I agree with you.

THE COURT:—whether on dunnage or on Eddie Blow or whoever it might be on.

Counsel for the shipowner moved for a directed verdict on the third-party action against Old Dominion, and in that connection the court and counsel made certain statements pertinent portions of which are additionally set out in the margin.[2] Shipowner's motion was denied and the trial before the jury then continued on the issues as to the amount of plaintiff's damages and the claim of the shipowner against the third-party defendant for indemnification. The jury fixed Blow's damages at $25,000 and found against the shipowner and in favor of Old Dominion on the indemnification claim.

Disappointingly, the district court did not clearly indicate the basis of its finding of unseaworthiness. One principal fact was established beyond question— the falling of the door into the hatch was directly caused by the slings when they caught on the door and lifted it off its hinges. While it may readily be deduced from the judge's comments that, in his view, the door was open and was extending over the hatch coaming when it was caught by the slings, he made no specific finding to the effect. It is, however, implicit in the judge's remarks that he found that "these reefer doors" were dangerously positioned close to the hatch, that "no matter where they were" one was caught by the slings and that the uncapped upright pins, open-ended and unsecured at the top, which served as door hinges were inadequate to withstand the force of the upward pull of the slings and the dislodging of the door. Particular attention is directed to the judge's comments as follows:

"* * * and in this situation, it just seems to me as though this case is a legitimate controversy between the third-party plaintiff and third-party defendant. There can be no question

---

SHIPOWNER'S COUNSEL: I agree with you.

THE COURT: And while ordinarily I am very reluctant to direct a verdict, it seems to me in this case that, at the very best, from the standpoint of the shipowner, the stevedore did create an unseaworthy condition which, in fact, may have been initially started by the shipowner in the sense that even if you take Mr. Hartman's testimony, which is the best part of the case for you, Mr. McCoy [shipowner's counsel] from this angle of it—accepting his testimony and all inferences therefrom, we have reefer doors that had been used that morning by the ship's crew that, by inference perhaps, you could say they were folded back against the bulkhead, although the rather overwhelming weight of the evidence is to the contrary, that is, at the time of the accident in question—but even then we've got an unseaworthy condition created in a particular area that had been previously occupied at least—* * *— but it had been previously occupied by ship's personnel and had been previously within the exclusive control of ship's personnel, and it just looks to me that even at the shipowner's very best you've got an unseaworthy condition created by perhaps the joint action of the shipowner and the stevedoring company. I am not saying that as a finding as such, but I am speaking now for the purpose of this motion.

2. MR. McCOY: I think, sir, that the issue of proximate cause still is a jury issue, but I would like to go a step further than the Court and state that if the Court accepts this—I think the Court termed it overwhelming act evidence as to the position of the doors—then that same overwhelming evidence tells us how long those doors had been there.

THE COURT: I think that is a matter for argument. I mean—

MR. McCOY: No, I am moving now—I am joining this to a—motion for a directed verdict on the third-party action, sir.

* * * * *

THE COURT: And now I will deny your motion because I think it is a factual situation there. I will say this, Mr. McCoy: If I were to be the trier of fact, I would say that there is ample evidence here to support the contention that the hatch boss, at least, knew about this condition. He states he did not report it to the foreman—* * *—who, I assume, was Mr. Hartman. There is evidence that Walter Mitchell saw the condition an appreciable period ahead of time.

MR. McCOY: Right.

THE COURT: I think there is some evidence to the effect that—no, Nathaniel Lewis, he was guessing as to whether he saw it, but certainly you got several others that you could effectively argue on that, but I am going to deny the motion of the third-party plaintiff. * * *."

about the fact that these reefer doors, *no matter where they were,* were not reasonably intended to be lifted off their hooks and deposited in the lower 'tween-deck. \* \* \*." (Emphasis added.)

Shipowner's counsel indicated approval of the foregoing comments of the judge by stating—"Yes, sir, I agree with you." The phrase, "no matter where they were," carries with it the implication that on the issue of unseaworthiness, it was immaterial whether the door was swinging out over the hatch or was tied back against the bulkhead when the slings lifted it from its hinges.

In any event, upon a careful review of the record, we are persuaded that there was no serious doubt in the minds of all counsel participating in the trial that the plaintiff's injuries were proximately caused by an unseaworthy condition. In its brief on appeal, shipowner states as follows:

"There are certain undisputed background facts which must be considered and they are as follows:

"The accident occurred when the empty slings caught on a protective steel door that is located in the No. 3 upper 'tween-deck on the inshore side which was open, extending over the coaming of the hatch, unseated that door from its hinges and caused it to fall to the lower 'tween-deck where it bounced into a wing (portion under the cover of the overhead deck) and struck Blow, an innocent victim, who of course had not assumed any risk and who was not negligent in any manner."

At other places in its brief shipowner concedes that the door extending into the work area of the open hatch was "a dangerous condition" and "a known hazardous condition."

■■ It is not necessary for the injured plaintiff, who bases his claim of injuries on unseaworthiness, to prove negligence on the part of the shipowner. The shipowner's duty to provide a sea-

worthy ship has been defined by the Supreme Court as absolute, nondelegable, and completely independent of the duty to exercise reasonable care. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

■ In Seas Shipping Co. v. Sieracki, supra, the Court in extending this duty to longshoremen, working as seamen, as well as to crew members, held that shipowner's liability is "essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the [maritime] service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. Mahnich v. Southern S. S. Co., supra; Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208; Carlisle Packing Co. v. Sandanger, supra [259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927]. It is a form of absolute duty owing to all within the range of its humanitarian policy." 328 U.S. at 94–95, 66 S.Ct. at 877. This principle has been applied by this court. In Scott v. Isbrandtsen Co., 327 F.2d 113 (1964), we said "\* \* \* the shipowner's duty to maintain a seaworthy ship is absolute and continuing; it is not delegable or to be escaped by turning over a part of the vessel to another." Id. at 123. (Citations omitted.) See also Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185 (4 Cir. 1964).

■ The thrust of the shipowner's contention, which was fully presented to the court below, is that the evidence

establishing an unseaworthy condition indicated that the stevedore's employees knew or should have known of it, that they failed to correct it, and that a verdict should have been directed in its favor on its indemnity claim against Old Dominion. The district court was of the opinion that there was conflicting evidence regarding the stevedore's knowledge of the unseaworthy condition and conflicting evidence as to who might have been responsible for it, which posed questions for resolution by the jury. We find ourselves in agreement with the district court's theory of the case.

■ The conflicting testimony of the witnesses hereinbefore summarized presents a question as to whether the accident was proximately caused by the stevedore's negligence. From the testimony of Mitchell and Williams, who stated that they observed the door in an open position just prior to the accident and that they had seen ship personnel using the open doorway, it could reasonably be inferred that one of the ship's crew had opened the door immediately prior to the accident since the longshoremen were not working in that area and had no occasion to use the door. In this connection it may be noted that, in response to an interrogatory, the shipowner answered that mate Vahavis, of the ship's crew, was an eyewitness to the accident. However, this witness was not produced at trial and there was no explanation offered as to his absence. It is well settled that the unexplained failure of a party litigant to call a material witness to give evidence in his behalf supports an inference that such witness, if permitted to testify, would testify against the interests of the party failing to present this testimony. Southern Cross Steamship Co. v. Firipis, 285 F.2d 651, 659, 84 A.L.R.2d 895 (4 Cir. 1960). On the trial of the indemnity claim the court charged the jury to that effect and Old Dominion's counsel emphasized the point in his jury argument.

There is Hartman's testimony that the door was tied back against the bulkhead when he observed it during the morning and from this the jury could infer that the stevedore had discharged its duty, that the door was in a safe position and that it had been released shortly prior to the accident so that it swung into the hatch and in the path of the sling which was then being raised. There is, of course, evidence which weighs against the stevedore, particularly that of hatch foreman Holloman who stated that he observed the door open fifteen or twenty minutes prior to the accident and that he left the hold five minutes before the accident but did nothing to remedy the situation. It was within the jury's province to decide these factual questions, to resolve any conflicts, to draw permissible inferences, and to assess the credibility of the various witnesses.

■ We are in full accord with the legal proposition, asserted by the shipowner, that where the negligence of the stevedore brings an unseaworthy condition into play, the stevedore has breached its implied warranty of workmanlike service, entitling the shipowner to indemnity. However, we find the cases cited by the shipowner and upon which it relies inapposite and distinguishable.

In Smith v. Jugosalvenska Linijska Plovidea, 278 F.2d 176 (4 Cir. 1960), cited by shipowner, the evidence was uncontradicted that the stevedore's safety man had observed the unseaworthy condition—a defective ladder—but failed to remedy it because he had seen three longshoremen descend it safely prior to plaintiff's injury and did not test or investigate it further. The evidence in the case at bar is in no such posture for there was conflict as to the position of the door and its use just prior to the accident. In *Smith*, supra, it was held that the stevedore through its safety man, rendered a substandard performance. While the same inference might be drawn from the evidence in this case, support for an opposite inference can be found.

Smith v. United States, 336 F.2d 165 (4 Cir. 1964), also cited by shipowner, is

likewise distinguishable. In that case indemnity was permitted against the stevedore because a longshoreman had been injured as the result of an unseaworthy condition. But the evidence clearly and unequivocally established the stevedore's negligence. The court found that the stevedore's employees had examined the defective condition—again a ladder—but had felt that it was reasonably safe for use. The occurrence of the accident pointed up the fact that the ladder was unseaworthy. Since the stevedore had examined it and failed to perceive the unseaworthy condition the stevedore was required to indemnify the shipowner. 336 F.2d at 171. In the case at bar there was evidence from which the jury could infer that after the stevedore was satisfied that the door was secured in a safe position one or more of the ship's crew had intervened to bring the unseaworthy condition into full play.

Affirmed.