UNITED STATES of America, Appellee,

v.

Harvey F. WATKINS, Appellant.

UNITED STATES of America, Appellee,

v.

Robert HASLETT, Appellant.

UNITED STATES of America, Appellee,

v.

Allen Douglas HICKS, Jr. and Don Kimbrough Gray, Appellants.

UNITED STATES of America, Appellee,

v.

Jose Antonio HERNANDEZ, Appellant.

Nos. 80–5065 to 80–5068.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1981.

Decided Nov. 5, 1981.

Edward T. M. Garland, Steven H. Sadow, Atlanta, Ga. (Garland, Nuckolls & Catts, P. C., Atlanta, Ga., on brief), for appellants Watkins and Haslett.

Frank Rubino, Coconut Grove, Fla., for appellant Gray.

William Regan, Charleston, S. C., on brief, for appellant Hernandez.

Ronald I. Strauss, Miami, Fla., on brief, for appellant Hicks.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S. C. (Thomas E. Lydon, Jr., U. S. Atty., Charleston, S. C., on brief) for appellee.

Before BRYAN, Senior Circuit Judge, and SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

Harvey Watkins, Robert Haslett, Allen Hicks, Jr., Don Gray and Jose Hernandez appeal the judgment of the district court, entered after a bench trial, finding them each guilty of all four counts on which they were indicted: conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846 (count one); conspiracy to import marijuana into the United States, in violation of 21 U.S.C. § 963 (count two); importation of marijuana into the United States, in violation of 21 U.S.C. §§ 952(a) and 960 (count three); and possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (count four).[1]

---

1. Three other defendants—Honario Montanez, Jose Mercado and Dennis Hensel—were named in the indictment. Prior to trial, Montanez pled guilty, Mercado's case was transferred to Florida under Fed.R.Crim.P. 20, and the government deferred prosecution of Hensel because of an acute illness. Additionally, the entire offload crew pled guilty prior to trial, and two members—Julian Morse and Benjamin Graham—provided testimony for the government. The

The appellants advance two principal contentions on appeal: first, that a boat, tractor-trailer, and van were searched in violation of the fourth amendment and second, that there was insufficient evidence to convict them of any of the offenses with which they were charged.

We find that there was no infringement of the appellants' fourth amendment rights and that there was sufficient evidence to sustain the convictions as to counts one and four, conspiracy to possess marijuana and possession with intent to distribute. We agree with the appellants, however, that there was insufficient evidence to convict them of conspiracy to import or importation of marijuana, and therefore reverse the convictions on counts two and three.

Sometime prior to November 19, 1979, Charleston County, South Carolina, police officers became suspicious of a tractor-trailer without proper exterior identification parked at a Howard Johnson's motel near Charleston. They learned that the owner of the tractor-trailer was Montanez, a guest at the motel. United States customs officers and DEA agents in turn were informed of these facts and a check by the DEA through its intelligence network revealed that Montanez had been convicted in Savannah, Georgia of importing 20 tons of marijuana. The tractor-trailer was placed under continuous surveillance, and on the evening of November 19, it was observed leaving the motel and heading north on Highway 17. It was followed by law enforcement officers in cars and an airplane. DEA agent Stein, in the airplane, followed the tractor-trailer to an isolated area near the North Santee River, but was unable to make further observations because it was dark and the tractor-trailer extinguished its lights. Stein advised the other involved law enforcement units of the tractor-trailer's location, checked for boats in the area and, finding none, landed the airplane at Georgetown Airport.

The river property where the tractor-trailer was parked belonged to Julian Morse, who had been a drug-smuggling suspect for approximately five years. DEA agent Cooke was the first law enforcement officer to arrive there. After hearing sounds which he thought to be a diesel boat engine, he conferred with customs officers Kinney and McDonald. McDonald then positioned himself in the woods near the Morse property. He heard voices and a diesel vessel maneuvering in the water, but neither he nor Cooke saw a boat there. He also heard a "thumping" sound, which he thought to be the sound of bales of marijuana as they hit the floor of a truck.

Kinney radioed customs officer Settles, instructing him to scramble a customs boat to the North Santee River area, in order to seal off the river. Cooke told Stein that a boat had been heard in the area of the tractor-trailer, and requested him to reactivate the air surveillance in order to identify the boat and its activity. Stein flew back to the vicinity of the tractor-trailer, and down the Santee Delta. He reached the confluence of the North Santee River and the intercoastal waterway around 1:30 a. m. on November 20.

Stein then advised Settles, in the customs boat, that he had seen what appeared to be an anchor light on a sailboat. Immediately thereafter, he saw another boat's spotlight come on in the intercoastal waterway, south of the anchored sailboat, and approximately 14 miles downriver from the Morse property. Stein advised Settles of this sighting, suggesting Settles check it first.

The customs boat proceeded south to overtake the vessel after the spotlight was seen. Settles saw the name *HUH?* on the vessel, and observed that it was a snapper or lobster boat. He noticed there were several antennae on the vessel, all in the down position as though she had recently been under a bridge. He also noticed that there was no fishing rigging or traps of any type on the vessel and that a small zodiac

parties stipulated that this testimony, the testimony adduced at the hearings on the motion to suppress, and the live testimony of Drug Enforcement Administration agent Stein, would constitute the trial record.

raft was on the bow of the boat. Settles identified himself as a "United States customs officer" and asked the captain to stop the vessel. The *HUH?* instead speeded away. Settles drew a weapon and commanded the man in the wheelhouse (later determined to be Watkins) to raise his hands. Watkins stopped the vessel. Settles boarded and observed the crew in the process of washing away marijuana residue. The occupants of the boat, Watkins, Haslett and Hensel, were then arrested.

The information about the marijuana residue found on the *HUH?* was radioed to Cooke who was still near the Morse property. Cooke concurrently received a communication from McDonald that a tractor-trailer and a black van were exiting the Morse property. Kinney and Cooke followed the van and the tractor-trailer in two separate vehicles. Kinney stopped the tractor-trailer, and Cooke stopped the van approximately one mile ahead as both were traveling on Highway 521. All three occupants of the tractor-trailer, Montanez, Mercado and Hernandez, were handcuffed and frisked at gunpoint by Kinney and other law enforcement officers. Residue was found on the rear bumper of the tractor-trailer. After it was field-tested and found to be marijuana, Kinney opened the inspection doors of the trailer and searched inside, finding marijuana bales.

Cooke stopped the van, arrested the occupants, Hicks and Gray, and searched the interior. There is conflicting testimony as to whether these arrests and the search of the van were prior to or after learning that the tractor-trailer was loaded with marijuana. The search disclosed marijuana residue on the van floor.

After the stopping of the tractor-trailer and the black van, McDonald returned to the Morse property where Julian Morse and the entire offload crew were departing the scene.

The parties stipulated that Morse would have testified that he met defendant Honario Montanez in the summer of 1979 and that Montanez came to his house on either November 15 or 16, 1979, to determine if the tractor-trailer would be able to get onto his property near McClellanville, South Carolina; that he (Morse) was to provide the local knowledge of the area and provide a crew to offload the marijuana; that he hired seven persons, including Benjamin Graham, as the crew and they were to be paid between $10,000 and $50,000 each; that the vessel which Benjamin Graham met at the sea buoy near Winyah Bay, South Carolina (stipulated to be within three miles of the South Carolina coast), arrived at his property on the North Santee River and its marijuana offloaded, loaded into a pickup and van, and then transferred to Montanez's tractor-trailer; and that Don Gray drove the black van onto his property on the evening of November 19, 1979.

It was also stipulated that Benjamin Graham would have testified that he was hired by Julian Morse to be a part of Morse's offload crew for a shipment of marijuana being smuggled into South Carolina; that on the evening of November 19, 1979, he and Allen Hicks, Jr., met a vessel near the sea buoy off Winyah Bay, South Carolina between 3:00 and 4:00 p. m., and then at dark led the vessel down the intercoastal waterway to Morse's property on the North Santee River; that the marijuana was offloaded from the vessel into a pickup and van and then transferred into Montanez's tractor-trailer; and that he did not know any of the crew members aboard the vessel which brought the marijuana onto the Morse property.

### I.

Appellants' first contention is that the warrantless searches of the *HUH?*, the tractor-trailer and the van violated their fourth amendment right to be free from unreasonable searches and seizures.

### A.

■ Individuals on boats and ships, of course, are entitled to fourth amendment protection against unreasonable stops and searches. Reasonableness, however, is inevitably measured by the nature and circumstances of each investigation. A seagoing

vessel as well as a land vehicle may be properly searched by officers without a warrant under *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925),[2] whenever there is both probable cause— "the facts and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information, were sufficient in themselves to warrant a man of reasonable caution in the belief that [contraband] was being transported in the [vessel] which they stopped and searched"— and exigent circumstances—"it is not practicable to secure a warrant because the [vessel] can be quickly moved." *Id.* at 153, 162, 45 S.Ct. at 285, 288.

In addition, 19 U.S.C. § 1581 provides in pertinent part:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

. . . .

(e) If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel or vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.

The stop of the *HUH?* was permissible under both 19 U.S.C. § 1581 and the *Carroll* exigent circumstances exception.

A simple reading of section 1581 suggests an extremely broad grant of authority to customs officers to stop and search vessels at any place in the United States or in customs waters. Appeals courts directly facing the issue, however, have indicated that the freedom of customs officers to act without warrant or reasonable suspicion is limited to boardings for routine safety and document checks of vessels within customs waters or initially sighted within customs waters and followed into intercoastal waterways prior to boarding. *United States v. Whitaker*, 592 F.2d 826 (5th Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *United States v. Freeman*, 579 F.2d 942 (5th Cir. 1978). Customs waters are defined in 19 U.S.C. § 1401(j), as to an American vessel, as "the waters within four leagues [12 nautical miles] of the coast of the United States," and do not include inland waters inside the coastline. Only one court has addressed the question of whether an investigatory stop of a vessel in inland waters may be made under section 1581 with less than reasonable suspicion to believe a customs violation has been committed. It answered in the negative, although without basing its holding on fourth amendment grounds. *United States v. Acosta*, 489 F.Supp. 61 (S.D.Fla.1980).

Other cases have held, however, that a stop of a vessel in inland waters under section 1581 passes fourth amendment scrutiny if the customs officers have reasonable suspicion of a customs violation. *United States v. Serrano*, 607 F.2d 1145 (5th Cir. 1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *United States v. Kleinschmidt*, 596 F.2d 133 (5th Cir. 1979); *United States v. Whitmire*, 595 F.2d 1303 (5th Cir. 1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Since we hold that there was reasonable

---

**2.** *Carroll* has been cited as authority to search ships without a warrant in other cases. *See e. g., United States v. Hensler*, 625 F.2d 1141 (4th Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); *United*

*States v. Williams*, 617 F.2d 1063 (5th Cir. 1980); *United States v. Weinrich*, 586 F.2d 481 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

suspicion to believe that the *HUH?* had committed or was committing a customs violation, we need not address the question of whether a stop can be made in inland waters without reasonable suspicion.

■ Prior to stopping the *HUH?*, Settles knew that a convicted smuggler had been identified and his tractor-trailer rig followed to the coastal property of a suspected drug smuggler. Law enforcement officers near the Morse property reported hearing a diesel vessel maneuvering in the North Santee River and a thumping sound which, from their experience, they thought to be bales of marijuana being loaded into the tractor-trailer. Shortly after the vessel departed the area, the tractor-trailer and a black van also left the property. The vessel *HUH?*, when first spotted, had no running lights and was only intermittently using a spotlight. When the customs boat approached the *HUH?*, Settles noticed that there was no fishing rigging or traps on the vessel, although it was a fishing boat, and that there were several electronic antennae all in a down position as if the boat had been under a bridge. The stopping and boarding of the vessel *HUH?* under these circumstances followed a reasonable suspicion of a customs violation. Moreover, the initial evasive action of those aboard the *HUH?* when Settles attempted to stop her and the marijuana residue in plain view gave more than probable cause to search it.

### B.

■ The DEA agents, customs officers and county police officers surveilling the van and the tractor-trailer after their departure from the Morse property were aware of the identity of the owner of the truck, that its arrival and departure corresponded with the presence of a diesel vessel, and all of the facts developed from the search of the *HUH?*. All of this provided a reasonable suspicion that the van and tractor-trailor were involved in illegal activity and justified the stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607

(1975). After the stop of the tractor-trailer, the officers observed and identified marijuana on its rear bumper, giving probable cause to search the interior. *Carroll, supra.*

■ Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it was only after the discovery of the bales of marijuana in the trailer that the van was searched. The tractor-trailer and the van being present where contraband was apparently loaded and their traveling together in an apparent convoy over the back roads in a circuitous route provided reasonable suspicion for stopping the van and that, together with the discovery of the bales of the marijuana in the tractor, provided probable cause for searching the interior of the van. Under these circumstances, the fact that a search warrant for the tractor-trailer might have been obtained earlier does not tarnish either search. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Newbourn*, 600 F.2d 452 (4th Cir. 1979). The officers had probable cause to search both the tractor-trailer and the van and the justification for the search arose suddenly. The searches, therefore, were valid. *United States v. Milhollan*, 599 F.2d 518 (3d Cir.), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979); *United States v. Patterson*, 492 F.2d 995 (9th Cir.), *cert. denied*, 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974).

### II.

Appellants' second contention on appeal is that there was not sufficient evidence to convict them of any of the four counts.

### A.

■ All of the defendants were convicted of conspiracy to possess marijuana and possession of marijuana with intent to distribute. To prove a conspiracy to possess marijuana with intent to distribute, the government must show the existence of an agreement to effectuate a criminal act. *United States v. Laughman*, 618 F.2d 1067

(4th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980); *United States v. Peterson*, 524 F.2d 167 (4th Cir. 1975); *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976). The existence of the agreement, however, need not be proven by direct evidence, but may be inferred from the facts and circumstances of the case. *Laughman, supra.* The trial court was well within its factfinding province in inferring that there was a conspiracy among at least some of the defendants to possess the marijuana with an intent to distribute it. The evidence establishes that more than eleven tons of marijuana was delivered by boat to the Morse property where a crew of eight men, under cover of darkness, offloaded it into a van and subsequently transferred it into a tractor-trailer, both vehicles then exiting the Morse property. Some, if not all, of the participants who were on the vessel *HUH?*, on shore unloading the obviously illegal cargo and transferring it to the van and truck, and driving away, were of necessity parties to a common planned operation.

■ To convict an individual defendant of conspiracy, of course, requires more than merely establishing the existence of a conspiracy. The government must also prove each defendant's knowledge of the conspiracy's purpose and some action indicating his participation. *Laughman, supra; United States v. Prince*, 515 F.2d 564 (5th Cir.), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 406 (1975). In the case *sub judice*, marijuana residue was found aboard the *HUH?.* The *HUH?*, a lobster vessel, had little fishing equipment and was running after dark without lights. Moreover, the *HUH?* speeded up when customs officer Settles asked it to stop, and the crew was attempting to wash marijuana residue from the boat. The district court could reasonably infer from these facts, and the other subsequently developed facts, that Watkins and Haslett, two of the three men aboard, were aware of the presence of the marijuana and were participating in the conspiracy to possess and distribute it.

The participation of Hernandez in the conspiracy was adequately established by evidence pertaining to the tractor-trailer. It belonged to a convicted drug smuggler, was driven to the Morse property immediately prior to the time the offloading took place and left immediately thereafter. After residue found on the rear bumper of the tractor-trailer was determined to be marijuana, the trailer was searched and marijuana bales found therein. Qualitative inferences similar to those drawn by the court in *Laughman*, in considering the vehicles transporting the marijuana there, can be drawn here: The driver of a vehicle has knowledge of the contraband it contains and this knowledge can also be imputed to the passengers because of their relationship to the driver and other probative circumstances.

It was stipulated that Hicks met a vessel transporting a large quantity of marijuana, off the South Carolina coast and led it down the intercoastal waterway to the Morse property. It was also stipulated that Gray drove the van onto the Morse property and that a van was used to offload the marijuana from the vessel and transfer it to Montanez's tractor-trailer. The van in which Hicks and Gray were riding left the Morse property with the tractor-trailer and traveled in close proximity to it. This was more than sufficient evidence under *Laughman* to connect Hicks and Gray to the conspiracy to possess marijuana with an intent to distribute.

■ The trial court was also correct in holding there was sufficient evidence to convict the appellants of possession with intent to distribute. It was established that the defendants were each participants in a conspiracy to possess and distribute marijuana. Actual possession of the marijuana is not a prerequisite to finding each guilty of the substantive charge of possession with intent to distribute. Constructive possession is sufficient. This exists when each defendant exercises, or has the power to exercise, dominion and control over the item. *Laughman, supra.* Additionally, possession of a large amount of marijuana among several people working together

may be sufficient to show that each has constructive possession. *United States v. Gomez*, 529 F.2d 412 (5th Cir. 1976).

 In the case *sub judice*, the judge sitting as a factfinder could reasonably have believed that Watkins, Haslett and Hensel brought 23,000 pounds of marijuana in the *HUH?* onto the Morse property, that the marijuana was offloaded into a van driven by Hicks and Gray, subsequently transferred to a tractor-trailer, and transported from the Morse property over the back roads of South Carolina by Hernandez, Montanez and Mercado. At some stage of the transaction, each defendant had the power to exercise dominion and control over the marijuana such that he could have distributed it as he chose. Although Hicks and Gray protested that the bales of marijuana were found in the tractor-trailer while they were in the van, it would be incredible that they and those in the tractor-trailer were not a team exercising joint control over the marijuana. The totality of the evidence establishes one continuous operation, mutually executed by all five appellants with the assistance of others, for transporting marijuana onto and from the Morse property.

### B.

 However, the convictions of the appellants of conspiracy to import and importation of marijuana (21 U.S.C. §§ 963, 952(a) and 960) cannot stand. A defendant may not be convicted of importation of a controlled substance in violation of 21 U.S.C. §§ 952(a) and 960, unless it is proved beyond a reasonable doubt that the controlled substance taken from the defendant emanated from a point outside the United States and that the defendant brought it into the United States. *United States v. Soto*, 591 F.2d 1091 (5th Cir.), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); *United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). Although it is not necessary to prove that the defendants have been observed bringing the controlled substance into the United States, there must be some proof of importation. *United States v. Miranda*, 593 F.2d

590 (5th Cir. 1979). There is scant, if any, evidence in this case that the marijuana found in the vessel *HUH?* and the tractor-trailer was imported from a place outside the United States by any of the defendants. The vessel led in by Graham and Hicks was met at a sea buoy within three miles of the South Carolina coast. Stein admitted on cross-examination that the *HUH?* was too small to have made the trip from Columbia (where the marijuana allegedly originated) and there was no evidence that a larger vessel was involved. It is true that Stein stated an opinion that the marijuana was baled in Columbia. He did not qualify as an expert, however. His lay testimony identifying the bales as being similar to those he had seen from Columbia during his service as a drug enforcement officer was admissible, but, standing alone, was not sufficient to prove criminal importation.

The judgment of the district court finding the appellants guilty of counts 1 and 4 is affirmed; the judgment finding appellants guilty of counts 2 and 3 is reversed.

AFFIRMED IN PART, REVERSED IN PART.

