**UNITED STATES of America, Appellee,**

v.

**James R. HELMS, Robert F. Ihle, Robert C. Mason, Appellants.**

No. 81–5297.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 12, 1982.

Decided March 22, 1983.

Rehearing and Rehearing En Banc Denied June 2, 1983.

---

G. Dan Bowling, Charleston, S.C. (Goodstein & Bowling, Charleston, S.C., on brief), for appellants.

Lionel Lofton, Asst. U.S. Atty., Charleston, S.C. (Henry Dargan McMaster, U.S. Atty., Wells Dickson, Asst. U.S. Atty., Columbia, S.C., Frances Lee Cain, Third Year Law Student on brief), for appellee.

Before RUSSELL and ERVIN, Circuit Judges, and EUGENE A. GORDON, Senior United States District Judge for Middle District of North Carolina, sitting by designation.

DONALD RUSSELL, Circuit Judge:

The appellants—the captain and two crew members of a sailboat—were convicted of violating the Federal Drug laws as a result of a search of the vessel apprehended traveling inland from "outside" through the Five Fathom Creek Channel off the coast of McClellanville, South Carolina. The validity of such search is the sole issue on appeal. The District Court found the search valid and it is that decision from which this appeal is taken. We affirm.

In proceeding from the docks at McClellanville to the ocean, ships pass through Jeremy Creek, across the Intracoastal Waterway (identified as ICW in the record) into Five Fathom Creek which provides the channel leading out to the ocean. A detail of United States Customs Officers, consisting of Captain Bell and Officers Williams and Southern, were on patrol in a Customs boat off the coast of McClellanville in Five Fathom Creek on the nigh of January 21–22, 1981. The officers had received information that there was a mother ship at sea off the coast with a load of marijuana. They stationed themselves in the channel of Five Fathom Creek, a mile or so seaward beyond the juncture of such Creek and the ICW, in order to permit them to observe any boat moving down the channel from "outside."

Between two and two-thirty in the morning, one of the officers "observed a light headed in [his] direction through Five Fathom Creek from the ocean .... At this time [his] fellow officers didn't see it. [He] alerted them because there was a light out in the direction of the ocean ...." When first seen, this light appeared to the officer to be about "three to five miles" from his location. Captain Bell, after he was alerted to the situation, testified also that the light indicated a vessel which "appeared to be coming in from outside." At first, Captain Bell assumed the vessel was a shrimp boat returning from the sea but, as he and the other officers continued to observe the approaching vessel, he "realized that the lights that were being displayed were too high in relative position to the water for [the vessel] to be a shrimp boat." Both of the lights he saw were on the vessel's mast, one on top of the mast and the other about fifteen feet lower. The top light was the "red-green running light" and the lower one was white. As the vessel drew nearer a light in its cabin was also seen.

While the vessel, using a spotlight to "mark [its] way", continued down the channel from "outside," the officers moved their boat "into a smaller creek to the side" of Five Fathom Creek and tied up to a piling or dolphin. When the vessel was about a mile away, Captain Bell recognized that the vessel was a sailboat and realized that it was coming toward the location of his boat. He ordered the engine of his boat started and moved into the channel. As he did so, he noted that "the specific shape of the vessel" indicated that "it was a potentially form built [foreign] vessel." At that time he "decided to go over and at least identify the vessel." When the Customs boat approached the stern of the vessel, Captain Bell observed "no name or hailing port on the vessel," which caused him to believe there was "something unusual" about the

vessel. He also saw two men on the vessel "dressed like they had foul weather gear on, looked like they had come from outside." He hailed the vessel and identified himself and his accompanying officers as "U.S. Customs", inquiring at the time of the captain of the vessel "where he was coming from." The reply of the vessel's captain was that he was coming from "Wilmington," which Captain Bell took to mean Wilmington, North Carolina.

Captain Bell testified that, in order for the vessel to have come from Wilmington to the point where it had been sighted by the officers "would require that [it come] in from outside through territorial waters of the United States, if not even further out."[1] After receiving this information that the vessel had come from Wilmington and thus "through territorial waters," Captain Bell told the vessel's captain, the defendant Helms, that he was sending aboard a party to inspect the vessel's papers.

At Bell's instructions, Officers Williams and Southern boarded the vessel in order to "check [its] papers." To the request of the boarding officers for the vessel's papers, the vessel's captain responded that the vessel was leased. The officers inquired whether they could see the lease. The captain agreed but said the lease was below. The officers, with Captain Helms' consent, accompanied the captain "below." The captain presented the officers with the lease, which gave the name of the owner of the vessel as Howard Incator of Monroe County, Florida, was dated December 15, 1980, and was to run for three months. When the officers went below, they noted what they identified both by sight and smell as marijuana bales stacked openly on the beds and elsewhere in the vessel. They instructed the captain to return to the deck and to gather his crew. The officers reported to Captain Bell that they had discovered what they took to be contraband aboard. Captain Bell instructed them to bring the boat into the docks at McClellanville where the defendants were arrested. When they searched the boat it was found loaded with marijuana. This prosecution followed.

The defendants initially moved to suppress the fruits of the search and the District Court denied the motion, predicating its denial on the fact "that the Customs people under 1581(a) . . . do not violate the Fourth Amendment when they stop any vessel of this type to seek its papers, its documentation." Later the Court added: "They [the Customs officers] don't even contend there was any reasonable suspicion. They stopped it under the authority of 1581(a) which I think they had authority to do. And once they got on board, I found as a fact, the only testimony before me is that the captain, Mr. Helms said that he didn't have any manifest; but he had leased the boat. The lease was down below. I think it was entirely appropriate for the officers to go down below with him. I think for security reasons that was proper from them to do and I so find as a fact; and once down there they saw the marijuana in plain view. They didn't snoop around. It was right there. There wasn't any question once they got below and saw the marijuana they had every reason in the world to arrest the occupants and every reason and right to take them." The defendants challenge the validity of these rulings.

▮ As the District Court noted, Customs officers are, by express statute, authorized to stop and board for a documentary examination any vessel within the "customs waters," statutorily defined as "waters within four leagues [12 nautical miles] of the coast of the United States," with or without any suspicion of criminal activity

---

1. According to the statement of the defendant Ihle, given after his arrest and after being given his *Miranda* rights, the vessel had sailed initially from Hammond, Florida, to Colombia, South America, where it had taken on the load of marijuana. The vessel proceeded back up the eastern coast, intending to dock at some point along the coast of South Carolina. Interesting- ly, South Carolina was selected for docking because, according to what Ihle was told, the penalties for marijuana violations were understood to be less severe than elsewhere. The voyage from Florida to South America and back up to the coast of South Carolina, had taken forty-four days. This statement was admitted at trial only against the defendant Ihle.

and such stops are traditionally within the reasonableness standard of the Fourth Amendment, §§ 1581(a) and 1401(j), 19 U.S.C.; *United States v. Ramsey,* 431 U.S. 606, 610, 97 S.Ct. 1972, 1975, 52 L.Ed.2d 617 (1972).[2] The authority to stop, however, does not ordinarily extend to "inland waters," but even "in territorial waters running from the coast to the three mile border at sea," [*i.e.,* in "inland waters"] such authority to stop a vessel for a documentary check may constitutionally be exercised by both the Coast Guard and by Customs Officers,[3] as the "functional equivalent" of a valid border stop, without suspicion of any criminal action, provided there is evidence indicating "some degree of probability that the vessel [had] crossed a border; *i.e.,* the officials must possess some articulable facts tending to show that the vessel had recently crossed an international border," *United States v. Laughman,* 618 F.2d 1067, 1072, n. 2 (4th Cir.1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117, or there is "a reasonable suspicion that the [vessel] had crossed the border," *United States v. Fogelman,* 586 F.2d 337, 343 (5th Cir.1978), or that the vessel had come "from international waters and crossed the territorial border," *Blair v. United States,* 665 F.2d 500, 505 (4th Cir. 1981).[4]

■ Evidence of "a degree of reasonable probability" that a vessel sighted in "inland waters" has "recently crossed a border will ordinarily be wholly circumstantial," *United States v. Bilir,* 592 F.2d 735, 740 (4th Cir. 1979), but "[n]o rigid formula" may be prescribed for what may qualify as adequate circumstantial evidence in establishing such "reasonable cause," *United States v. McGlone,* 394 F.2d 75, 78 (4th Cir.1969). Certainly, the circumstantial evidence need not reach the level of a showing that the Customs officers had observed the vessel in the act of actually crossing the territorial border as a basis for stopping the vessel and we have so held in *United States v. McGlone,* 394 F.2d at 78, declaring in that case that the constitutionality of the stop "is not dependent upon showing that ... the [vessel] that is searched actually crossed the border." [5]

■ Moreover, whether there has been a border crossing or its "functional equivalent" is a question of fact which, like any

---

**2.** In *Ramsey,* the Supreme Court said:
> "This longstanding recognition that searches [made] at our borders without probable cause and without a warrant [known generally as border stops] ... [are 'reasonable' within the Fourth Amendment] has a history as old as the Fourth Amendment itself." [p. 610, 97 S.Ct. at p. 1975]

**3.** There is no real difference between the statutory authority of the Coast Guard under § 89(a), 14 U.S.C., and that of Customs Officers under § 1581(a), 19 U.S.C., *United States v. Alonso,* 673 F.2d 334, 336 (11th Cir.1982).
The Court in *United States v. Freeman,* 579 F.2d 942, 946 (5th Cir.1978), states that the authority of the Coast Guard is given under § 89(a), 14 U.S.C., and adds:
> "It would be anomalous to suggest that the nearly identical language of § 1581(a) does not afford Customs officers the constitutionally acceptable authority to make document checks within the Customs waters."

**4.** The Court in *United States v. Ader,* 520 F.Supp. 313, 321 (D.S.C.1980), stated correctly the reason for this justification of the "functional equivalent" border search or for "the 'extended border search' under which 'border' is given a geographically flexible reading within limits of reason related to the underlying constitutional concern to protect against unreasonable searches" to be:
> "The many difficulties that attend the attempt to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers at the borders of a country have by necessity led to this exception. Therefore, some searches by Customs officials, although conducted at points physically away from an actual border and removed from the precise time of importation, may nevertheless be treated as border searches."

**5.** *See also* to the same effect, *United States v. Whitmire,* 595 F.2d 1303, 1307 (5th Cir.), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), which put it:
> "In water cases, the true border is an imaginary line three miles offshore. Though we have not required the coast guard or customs officers to observe the vessel as it crosses this imaginary line, our precedent generally has required that the officials have articulable facts from which they may reasonably infer that the boat has come from international waters."

other fact at a suppression hearing, need be established only by a preponderance of the evidence, *United States v. Matlock,* 415 U.S. 164, 177, n. 14, 94 S.Ct. 988, 996, n. 14, 39 L.Ed.2d 242 (1974), and direct or circumstantial evidence sufficient to justify an inference by the custom officers of a border crossing by a vessel is sufficient to uphold the stop. *United States v. Johnson,* 588 F.2d 147, 155 (5th Cir.1979); *see also, United States v. McGlone, supra,* 394 F.2d at 78.

■ There is ample evidence in this record to meet the test of "some degree of probability"[6] of "some articulable facts tending to show," or there is "a reasonable suspicion,"[7] of "articulable facts from which [it] may reasonably [be] infer[red],"[8] that the vessel in this case had recently crossed into territorial waters. The vessel in question was first observed some three to five miles from the officers as they were anchored in Fathom Creek. When so observed, it was proceeding from the "outside" down the channel, toward either the docks at McClellanville or the ICW. The officers were at a point a mile or more seaward beyond the juncture where the ICW crossed the Jeremy Creek channel and it was plain that the vessel, traveling in the direction and at the spot where it was first observed, had not come from the ICW. Moreover, when the Customs officers first hailed the vessel and inquired of its captain where the vessel had come from, the prompt response was Wilmington, which the officers reasonably assumed referred to Wilmington, North Carolina. Captain Bell testified positively and without any contradiction that, in order for the vessel to have come from Wilmington, it would have had to have traveled from "outside . . . through territorial waters." This testimony, not being disputed, established that the vessel had "recently crossed an international border"

6. *United States v. Bilir,* 592 F.2d at 740.

7. *United States v. Laughman,* 618 F.2d 1072, n. 2.

8. *United States v. Whitmire,* 595 F.2d at 1307.

9. In this case, we found ineffective representation of counsel because counsel had not called

and thus met the test stated in *Laughman,* 618 F.2d at 1072, n. 2, and *Fogelman,* 586 F.2d at 343.

■ This evidence establishing "some degree of probability" that the vessel had crossed through "territorial waters" was, of course, subject to rebuttal. The defendants could have done this by their own testimony at the suppression hearing and, most importantly they could have done this without any prejudice to their rights at trial, since their testimony at the suppression hearing could not have been used against them at such trial. That they could have done this is plainly declared in *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), where the Supreme Court said:

> "We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."

Moreover, we quoted this very language of *Simmons* in *United States v. Dickerson,* 655 F.2d 559, 561–65 (4th Cir.1981), where the defendant sought unsuccessfully to excuse his failure to testify at the suppression hearing because of possible prejudice to his Fourth and Fifth Amendment rights. *See also,* an earlier dictum in *Doe v. Boyle,* 494 F.2d 1279, 1280 (4th Cir.1974):

> ". . . the Supreme Court has held that testimony taken at an evidentiary hearing on a motion to suppress is inadmissible at the trial-in-chief (citing *Simmons* )."

*To the same effect: Wade v. Franzen,* 678 F.2d 56, 57 (7th Cir.1982); *cf., Kelly v. Warden,* 701 F.2d 311 (4th Cir.1982);[9] *United States v. Flores,* 679 F.2d 173, 177, n. 4 (9th Cir.1982).

the defendant as a witness at his suppression hearing on a search and seizure claim of invalidity. The rationale for the decision was that the defendant's testimony at the suppression hearing would not have been admissible against him at trial-in-chief.

When a party can without prejudice to his rights dispute or contradict testimony given against him by a witness by his own testimony, and he does not dispute such adverse testimony, it is well settled that a court is entitled to infer that his testimony, if offered, would not have contradicted such adverse testimony. *Smith v. State of N.C.,* 528 F.2d 807, 810 (4th Cir.1975); *Blow v. Compagnie Maritime Belge,* 395 F.2d 74, 79 (4th Cir.1968); *Southern Cross Steamship Co. v. Firipis,* 285 F.2d 651, 659 (4th Cir.), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). That rule is applicable here. As we have observed, Captain Bell testified that the defendant Helms told him the vessel had come from Wilmington. Bell testified that the vessel could not have come from Wilmington without crossing territorial waters. The defendant Helms, as well as his codefendants, knew whether that testimony was accurate in both particulars. If he or either of the other defendants wished to dispute the facts testified to by Captain Bell in this regard, they could have done so and done so without any prejudice to their rights at trial, as we have seen. Their failure to contradict the testimony of Captain Bell and the other officers warrants the inference that the officers' circumstantial testimony on this critical point was correct.[10]

The defendants, however, cite *Blair v. United States,* 665 F.2d 500 (4th Cir.1981) as holding that, under the circumstances of this case in which the vessel was stopped in "inland waters," there was no right to board the vessel in the absence of a reasonable suspicion of illegal activity and that there were no such reasonable suspicions here. They point to this language in *Blair* where the Court said that the seizure of a vessel "on inland waters, the Potomac River, *with no allegation that the vessel crossed an international border*" would not support a boarding of the vessel without a reasonable suspicion of illegal activity. (Italics added). *Id.,* at 505. We find no fault with such statement or the rule it

declares. That language is, however, manifestly inapplicable here, as the italicized language in the Court's statement clearly shows. The Government did allege and did offer credible proof warranting an inference of "a degree of reasonable probability" that this vessel had "crossed an international border," the significant omission of proof in *Blair.* Actually, the Government's evidence in this case at the suppression hearing was directed to this very point and was unquestionably sufficient to support the inference of a border crossing. *Blair* is accordingly easily distinguishable from this case.

The defendants suggest, without any evidence to support such an inference, that the vessel may have been traveling in the ICW and may never have been outside the three-mile limit. The difficulty with this suggestion is that the vessel was first observed some six miles from the inland waterways. It was, it is true, traveling toward a point where the ICW crosses Jeremy Creek but the significant fact is that it was traveling down the Five Fathom Creek channel from the sea side toward the Waterway. The defendants would, also, surmise that the vessel could have come from Wilmington without ever crossing into "territorial waters." But this is contrary to Captain Bell's undisputed testimony, which was that the vessel, in order to travel from Wilmington to the point where the officers first observed it, would have had to cross into "territorial waters." Nor should it ever be forgotten that the defendants could have disputed the circumstantial evidence pointing so clearly to the conclusion that the vessel had come from "outside" down the Jeremy Creek channel by testifying to the contrary and that they could have done this without any prejudice to their constitutional rights later at trial. *See Doe v. Boyle, supra,* 494 F.2d at 1280.

Finally, the defendants argue that the District Court found that "the only evidence I see is that the marijuana ... came beyond question that the vessel had crossed into "territorial waters."

---

10. It requires no clairvoyance to divine why the defendants chose not to testify. They would have been faced with Ihle's confession showing

down from Wilmington and there is no evidence that [the vessel] ever went outside the three-mile limit, much less outside the twelve-mile limit." This statement, they contend, represents a finding that there was no evidence supporting an inference of "a degree of probability of a border crossing," and that such finding must be accepted by us unless it can be said to be clearly erroneous. These remarks of the District Court, however, were not made in connection with its ruling on the motion to suppress but, later on the defendants' motion for a verdict of acquittal. The measure of proof and the issue in the two situations are entirely different. In the suppression hearing, the standard of proof is "the preponderance of the evidence;" in the acquittal motion (to be decided by the District Judge without a jury), the standard is "beyond a reasonable doubt." Similarly, the issue in the suppression hearing is whether there is sufficient evidence of "some degree of probability" or "some articulable facts tending to show that the vessel had come from 'outside;' " on the motion for a verdict of guilty by the Court, the question of a crossing must be established beyond a reasonable doubt. Moreover, in resolving the first issue, the Court is entitled to consider the defendants' failure to testify in contradiction of the circumstantial evidence of a crossing; on the motion for a verdict of guilty, the Court may not consider the defendants' failure to testify. What was ruled on the motion for a directed verdict of not-guilty would not, therefore, be the same as the ruling at the suppression hearing. The Government's evidence of "a degree of probability" of a border crossing in this case measured up to the establishment by the "preponderance of the evidence" of a reasonable inference of a border crossing, especially since, the defendants, though in a position to do so, had not disputed the compelling circumstantial evidence of a "degree of reasonable probability" of a border crossing[11] in the case either by other evidence or by their own testimony.

11. And, though this ground would be, according to the defendants' argument, different than that assigned by the District Court is immaterial.

Since "[t]he law is clear that the statute [§ 1581(a), 19 U.S.C.] authorize[d] a documentary stop [in this case] without a modicum of suspicion and that such [stop was] constitutionally permissible," *United States v. Alonso,* 673 F.2d at 336, it, therefore, follows that the stop of the vessel was authorized both under § 1581(a), 19 U.S.C. and the Constitution in this case. *See United States v. Alonso,* 673 F.2d at 336. Moreover, "an investigatory stop of a vessel [under § 1581(a) ] permits a boarding." *Blair v. United States,* 665 F.2d at 506. But, any maritime search of a vessel involves two distinct issues. The authority to stop and board is only the first of such issues. "Once on board, a further search [by the officers can] be constitutionally validated only by the existence of probable cause [to search] plus exigent circumstances." *United States v. Kleinschmidt,* 596 F.2d 133, 136 (5th Cir. 1979), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184. The observation of marijuana in plain view by the officers in this case, as they accompanied Captain Helms to obtain the vessel's lease, provided probable cause and the mobility of the ship constituted an exigent circumstance, justifying a search without a warrant. *United States v. Watkins,* 662 F.2d 1090, 1094–96 (4th Cir.), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982); *United States v. Alonso, supra; United States v. Kleinschmidt, supra.* At this point, a search was constitutionally permissible. The denial of the motion to suppress was accordingly correct.

Since the defendants' only claim of error relates to the denial of the motion to suppress, it follows that the judgments of convictions will be

AFFIRMED.

ERVIN, Circuit Judge, dissenting:

The government proceeded below on the theory that the search was valid under 19 U.S.C. § 1581(a). That provision gives customs officers broad powers to search vessels within the customs waters of the United

States.[1] Customs waters are those waters within 12 miles of the United States. 19 U.S.C. § 1401(j). The search here, however, occurred within the inland waters. Nevertheless, the district court held that the vessel properly was stopped under the authority of section 1581(a).

The district court's holding, affirmed by the majority, is in direct conflict with this court's decision in *Blair v. United States,* 665 F.2d 500 (4th Cir.1981). In *Blair,* we held that the authority to search under section 1581(a) did not extend to searches within inland waters. For a customs search within inland waters to be constitutional, it must either be a border search or based upon reasonable suspicion of illegal activity. *Id.* at 505. As indicated by the following colloquy between the district court and the Assistant United States Attorney, the district court did not have the benefit of our decision in *Blair,* which was decided after the trial:

> THE COURT: I don't see that the Fourth Circuit has passed expressly on this issue .... I don't see ... any requirement that in order just to stop for an administrative search that you've got to have reasonable suspicion that it came across the border .... I may be wrong, but I'm just following the cases. Not to sustain the boarding in this case, I'd have to chart waters that have never been charted before, because every time this issue had been raised that I can find, the authorities have held in the case that we've discussed that the customs people under 1581(a) as the Fifth Circuit says, they do not violate the Fourth Amendment when they stop any vessel of this type to seek its papers, its documentation... [w]ithout any reasonable suspicion. Mr. Dixon, can you tell me any reason they had reasonable suspicion to stop this boat?

MR. DIXON: Not specifically, Your Honor. They said they were just checking boats as they came in under 1581.

THE COURT: I agree. If you go up to the Fourth Circuit and I found because I don't believe there was any reasonable suspicion the government doesn't even contend that there was any reasonable suspicion, so you've got a clear cut issue if you want it.... They stopped it under the authority of 1581(a) which I think they had authority to do.

On appeal, the government attempts to save its case by arguing that the stop was a valid border search. Because the record is barren of any "articulable facts tending to show that the vessel [had] recently crossed an international border," *United States v. Laughman,* 618 F.2d 1067, 1072 n. 2 (4th Cir.1980), I cannot agree with the majority's holding that the search was a valid border search.

Customs officials may conduct routine warrantless border searches at international borders or their "functional equivalent" regardless of whether there exists probable cause to believe an illegal activity is occurring. *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1972). There cannot be a border search, however, "without some degree of probability that the vessel had crossed a border; *i.e.,* the officials must possess some articulable facts tending to show that the vessel has recently crossed an international border." *Laughman,* 618 F.2d at 1072 n. 2.

The relevant international border is the three-mile limit, a border line in the ocean that is three miles from shore. "Territorial waters" are those parts of the ocean extending from the shore line to the three-mile limit. Waterways located inside the shore line are "inland waters."

The majority cites two facts that supposedly show a sufficient probability that the

---

1. 19 U.S.C. § 1581(a) provides, in pertinent part:

   Any officer of the customs may at any time go on board of any vessel ... at any place in the United States or within the customs waters ... and examine the manifest and other documents and papers and examine, inspect, and search the vessel ... and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel ... and use all necessary force to compel compliance.

vessel crossed the three-mile limit: (1) the vessel first was observed some three to five miles away from the officers proceeding inland from the direction of the ocean; and (2) the customs officers thought the vessel had sailed from Wilmington, North Carolina, which would have required it to have "been coming in from outside [2] through territorial waters of the United States, *if not even further out.*" (emphasis added). Those two facts tend to show only that the vessel had sailed in territorial waters, and not beyond the three-mile limit.

Although the vessel was three to five miles away when first sighted, the vessel was at that time within Five Fathom Creek, *i.e.* inland waters, some five miles inside the three-mile limit. That a vessel in inland waters happens to be sailing further inward away from the ocean may indicate that it recently had been in the territorial waters part of the ocean, but is not very probative that the vessel recently had crossed the three-mile limit.

Furthermore, the testimony that a vessel coming from Wilmington could not have come through the inland waterways and must have been "coming ... through territorial waters" likewise is not probative of a border crossing. It certainly is possible to sail through territorial waters without crossing the three-mile limit. Customs Officer Bell admitted as much when he stated the vessel came through territorial waters, "if not even further out." The majority unjustifiably equates "coming ... through territorial waters" with "cross [the three-mile limit] into 'territorial waters.'" At 765.

Since the government did not proceed below on the theory that this was a border search, the district court did not make any specific findings in that respect. Nevertheless, the district court's statement that "there is no evidence that [the vessel] even went outside the three-mile limit" is, based on my reading of the record, an accurate summation of the evidence. Therefore, I must respectfully dissent.

---

**2.** In his testimony before the district court, Customs Officer Bell repeatedly used the term "outside." When asked to define the term, he stated that it meant "ocean" and indicated that it included the territorial waters as well as those waters further out; that is, "outside" means outside the shore line and not necessarily outside the three-mile limit.