946 F.2d 888
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Salviano Alamo WILLIAMS, a/k/a Sharon Lovett Cornelius,
a/k/a Gloria Lockett, a/k/a Salviano Davis, a/k/a
Sal Williams, Defendant-Appellant.
 No. 90-5731.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1991.
Decided Oct. 8, 1991.
As Amended Oct. 23, 1991.
 
 1
 Appeal from the United States District Court for the Eastern District of North Carolina, Fayetteville. Malcolm J. Howard, District Judge. (CR-90-24)
 
 
 2
 Argued: William Lee Davis, III, Lumberton, N.C., for appellant.
 
 
 3
 Thomas Wayne Dworschak, Special Assistant United States Attorney, Raleigh, N.C., for appellee.
 
 
 4
 On Brief: Margaret Person Currin, United States Attorney, Raleigh, N.C., for appellee.
 
 
 5
 E.D.N.C.
 
 
 6
 AFFIRMED.
 
 
 7
 Before K.K. HALL, Circuit Judge, and STAKER, United States District Judge for the Southern District of West Virginia, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, Sitting by Designation.
 
 OPINION
 STAKER, District Judge:
 
 8
 Appellant Salviano Alamo Williams, also known by several aliases and herein called the "defendant," was found guilty by a jury and adjudged convicted of the following offenses in the United States District Court for the Eastern District of North Carolina:
 
 
 9
 Count One--conspiracy, in violation of 18 U.S.C. § 371, fraudulently to steal and purloin military benefits and privileges from the United States, in violation of 18 U.S.C. §§ 641 and 1001;
 
 
 10
 Count Two--stealing and purloining U.S. currency, the property of the United States, of a value greater than $100, and aiding and abetting another to do so, in violation of 18 U.S.C. §§ 641 and 2;[1]
 
 
 11
 Counts Four through Fifteen, respectively--drawing and delivering to others different checks upon defendant's account at each of two different banks, without his having had sufficient funds or credit with those banks for those checks to be paid by them, in violation of North Carolina General Statute § 14-107, assimilated by Title 18, United States Code, Section 13; and
 
 
 12
 Count Sixteen--stealing and purloining U.S. currency, the property of the United States, of a value in excess of $100, in violation of 18 U.S.C. § 641.
 
 
 13
 All of those offenses were charged to have been committed on different dates, or during different periods of time, between August 22, 1985 and August, 1989.
 
 
 14
 The defendant was sentenced to serve a term of twenty-seven months imprisonment. Upon this appeal, he seeks reversal of his convictions, asserting that the district court committed numerous reversible errors. Finding no such error, we affirm.
 
 
 15
 The bizarre facts and circumstances culminating in the defendant's indictment and convictions were established by the evidence presented at the hearing of the defendant's motion to suppress and that presented at his trial, each being separately summarized below.
 
 I.
 
 16
 The defendant asserts that his rights under the Fourth and Sixth Amendments of the United States Constitution were violated by the seizure of, and that the district court erred by overruling his pretrial motion to suppress, the following:
 
 
 17
 (a) evidence obtained from him by the Anniston, Alabama police and United States Army Criminal Investigation Division (CID) agents at the Anniston Police Station on May 23, defendant contending that he was unlawfully detained and interrogated by them there;
 
 
 18
 (b) evidence obtained by those police and CID Agents from the seizure of the contents of a cardboard box the defendant had left in the care of a Mrs. Trushka before his going to the Police Station on the morning of May 23, defendant contending the seizure thereof to have been unlawful;
 
 
 19
 (c) evidence defendant contends was unlawfully obtained by Dr. Turner, an Army physician who examined him pursuant to a search warrant, in a cell in the Anniston Jail on May 24, for the purpose of ascertaining his sex; and
 
 
 20
 (d) a military Identification Card (ID card) bearing the name Sharon Cornelius and having overstamped thereon the words "no check cashing privileges," which the defendant contends was unlawfully seized from his apartment in Anniston by CID Agent Mullens on July 24.
 
 
 21
 Evidentiary hearings on the defendant's motion to suppress were had before a United States Magistrate. The district court, having adopted the Magistrate's written findings of fact, conclusions of law and recommendation that it do so, overruled the motion to suppress. In doing so it committed no error.
 
 Evidence at Suppression Hearings
 
 22
 The facts found by the Magistrate in substance agreed with the following ones established by the evidence presented at the hearings had on the motion to suppress, little of which was disputed.[2]
 
 
 23
 On May 21, 1989, a woman reported to the Anniston, Alabama police that her husband, Aaron Hawk, was missing and she believed he had met with foul play.
 
 
 24
 Detective Robertson of the Anniston Police Department learned that Hawk's automobile had recently theretofore been seen parked outside defendant's apartment in Anniston.
 
 
 25
 At about 9:00 A.M., on May 23, 1989, Robertson and another officer drove to defendant's apartment and informed him that they were investigating Hawk's disappearance. The defendant then told them that he and Hawk were married on May 19, and on that evening Hawk had left the defendant's apartment,[3] but that Hawk was not missing and was in Anniston. Robertson requested the defendant to come to the Anniston Police Station and talk with him in connection with the investigation, and the defendant agreed to appear there about an hour later.
 
 
 26
 At about 11:00 A.M., or a little later, on May 23, the defendant appeared at the Police Station, and Robertson commenced interviewing him some thirty minutes thereafter. At the time of that interview, Robertson was still attempting to locate and talk with Hawk.[4] During that interview the defendant revealed that he was an hermaphrodite.[5] Upon Robertson's asking him for some identification, the defendant produced from his purse a driver's license and other identification[6] which Robertson ran through NCIC[7] and learned therefrom that the defendant was wanted on warrants issued in North Carolina for probation violations. He then telephoned the North Carolina authorities and verified that the defendant was wanted there and that they would extradite the defendant from Anniston to North Carolina. At 12:30 P.M., on May 23, he told the defendant that while no charges were pending against him in Alabama, he was then being arrested on those North Carolina warrants,[8] and the defendant was thereafter detained in the Anniston Jail pending his extradition to North Carolina. The interview lasted no more than one hour. The defendant was never detained or told that he could not leave the Police Station at any time from the time he arrived there until he was told he was under arrest. He was never informed of his Miranda rights because, as Robertson testified, he was suspected of no crime and the interview of him was for the purpose of locating Hawk.[9]
 
 
 27
 Before leaving his apartment to go to the Police Station on May 23, the defendant delivered to Mrs. Trushka, his neighbor, an unbound, unsealed cardboard box containing some papers and asked her to keep it for him until he called for it. After the defendant had been placed under arrest at the Police Station, Mrs. Trushka telephoned the Police Station and said that she had that box and had seen some of its contents and wanted it out of her house.[10] Robertson went to Mrs. Trushka's apartment, and she gave him the box, which he brought to the Police Station. Papers in that box, including two military ID cards, respectively showing the defendant to be the wife of Sergeant Michael Lovett and that of Staff Sergeant Louis A. Cornelius, bore information that was inconsistent with that which the defendant had told Robertson earlier, as a result of which Robertson telephoned CID Agent Warfeld, at Fort McClennan, which is near Anniston. Warfeld came to the Police Station that afternoon and the box and its contents were delivered to him.
 
 
 28
 On May 23, Fort Bragg CID Agent Gary Belcher, who had been investigating the defendant on worthless check charges there since the previous February happened to be at an Army installation in or near Anniston and was instructed by the Army CID to go to the Police Station and investigate the case. Upon arriving there at about 2:00 P.M. on that day, Agent Belcher saw the defendant and asked him if he remembered speaking with him on the telephone at Fort Bragg in February, 1989, and the defendant said that he did. While Belcher had never seen the defendant, he recognized him from his very distinctive voice.
 
 
 29
 Based upon an affidavit filed by CID Agent Warfeld, a United States Magistrate in Anniston issued a search warrant for the search of the defendant to ascertain his sex. That search warrant was executed on May 24, the morning after defendant's arrest, by a visual inspection of the defendant's person conducted by Army physician Dr. Turner in the cell occupied by the defendant in the Anniston Jail.[11]
 
 
 30
 After May 23, 1989, the Fort Bragg CID learned that the property in the defendant's apartment was to be "boxed up" as abandoned property, and CID Agent Mullens went to that apartment from Fort Bragg on July 25, 1989, and retrieved therefrom another military ID card in the name of Sharon Cornelius, having overstamped thereon "no check cashing privileges."
 
 
 31
 The defendant waived extradition, and on June 1, 1989, a North Carolina Probation Officer took custody of him at the Anniston Jail and transported him to North Carolina.
 
 
 32
 Based upon the above facts, the Magistrate concluded as follows in respect to the items of evidence the defendant had moved to suppress:
 
 
 33
 (a) The defendant voluntarily went to the Police Station on May 23, knowing that the Anniston police wanted to talk with him in an attempt to close their file on the report that Hawk was missing; the police had a supportable interest in interviewing the defendant about Hawk's disappearance; and the interview of him by Robertson was a non-custodial one and Miranda warnings were not required, citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (in determining whether a person is "in custody" for purposes of receiving Miranda protection, the court must look to the totality of the circumstances, and Miranda warnings are not required "simply because the questioning takes place in a station house," quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); United States v. Locklear, 829 F.2d 1314, 1316 (4th Cir.1987) (Miranda's extraordinary safeguard does not apply outside the context of custodial interrogations); United States v. Charles, 738 F.2d 686, 692 (5th Cir.1984) (both the burden of production and the burden of persuasion generally rest upon the movant in a suppression hearing).[12]
 
 
 34
 In Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir.1985), this court explained:
 
 
 35
 The Supreme Court has articulated the standard by which "custody" is to be judged. "[T]he ultimate inquiry," the court has noted, "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." ... The issue does not turn on the subjective evaluation of the situation by the defendant or the police officers; instead, the test is an objective one. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." ... Custody does not result merely because an individual is questioned in a "coercive environment," ... or is the "focus" of a criminal investigation.... (citations omitted).
 
 
 36
 It is undisputed that the interview of the defendant by Robertson was conducted solely for the purpose of investigating the report of Hawk's being missing and that it lasted no more than an hour. The defendant was never detained or in custody prior to being arrested. While he testified that he was in custody as soon as he arrived at the Police Station, he pointed to no facts which would tend to any degree whatever to establish such to be true. During the interview, he was never even suspected of having committed any crime upon which he could have been arrested until the NCIC check showed him to be wanted on the North Carolina warrants. Had that NCIC check not so shown, he would never have been arrested. In short, the totality of the circumstances here clearly shows that the defendant was never in custody at the Police Station at any time prior to his arrest there. Accordingly, none of the evidence that was obtained from him by the Anniston police or the CID Agents prior to his arrest on May 23 was required to be suppressed.
 
 
 37
 (b) In delivering the cardboard box and its contents to the police, Ms. Trushka did not act in a police capacity and rather acted on her own initiative, wherefore the contents thereof were not excludable from the evidence on constitutional grounds or any court-created prophylactic rule regulating police conduct, citing Coolidge v. New Hampshire, 403 U.S. 443, 487-90 (1971) (test is whether the person who delivers evidence, which is the property of a defendant, to the police, in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state in having done so, and an unreasonable search and seizure by a private person, not coerced, dominated or directed by the government, is beyond the scope of the fourth amendment); Pleasant v. Lovell, 876 F.2d 787, 796-98 (10th Cir.1989) and United States v. Black, 767 F.2d 1334, 1339 (9th Cir.), cert. denied, 474 U.S. 1022 (1985) (both holding that a wrongful search and seizure conducted by a private person does not violate fourth amendment); and United States v. Veatch, 674 F.2d 1217 (9th Cir.1981), (even if the private person turns the defendant's property over to police against the defendant's instructions to turn it over to a lawyer, the private person's doing so contrary to the defendant's instructions has no bearing upon the issue) cert. denied, 456 U.S. 946 (1982). Here, it was Ms. Trushka, and not the Anniston police, who initiated and carried out the delivery of the cardboard box and its contents to those police, she telling them that she wanted that box out of her house and they driving to her house to receive the box from her. In the light of those facts and all the other circumstances of the case, the Magistrate properly held that there was no basis to suppress the cardboard box and its contents.
 
 
 38
 (c) That the evidence resulting from Dr. Turner's examination of the defendant's person pursuant to the search warrant should not be suppressed, the Magistrate pointing out that the application for the search warrant recited facts which showed that the CID had sufficient reasonable, articulable suspicion as to defendant's sex, and as to whether he had fraudulently obtained services and benefits from the United States as a result of his marriages to two different members of the United States Army, to support the issuance of the search warrant authorizing the medical examination of the defendant to ascertain his sex; that there is no fourth or fifth amendment protection against compelled display of identifiable physical characteristics, citing United States v. Dionisio, 410 U.S. 1 (1973) (voice exemplars can be compelled); United States v. Mara, 410 U.S. 19 (1973) (as can handwriting exemplars). And a criminal suspect can constitutionally be required to submit to the "annoying, frightening, and perhaps humiliating experience" of a pat down search. Terry v. Ohio, 392 U.S. 1, 25 (1968). Blood samples may be extracted, Schmerber v. California, 384 U.S. 757 (1966), and facial and scalp hair samples and height and weight measurements may be obtained as part of a criminal investigation, In Re Grand Jury Proceedings (Mills), 686 F.2d 135 (3d Cir), cert. denied, 459 U.S. 1020 (1982). The Magistrate recognized that there is some level of intrusion beyond which government simply may not go without the fourth amendment's being implicated, citing McDonald v. Hunter, 809 F.2d 1302 (8th Cir.1987) (reasonable suspicion standard must be satisfied before body searches allowed of prison guards and visitors, arrestees, and persons at border), but pointed out that since the Army physician's examination of the defendant was conducted pursuant to a search warrant that had been issued by a neutral, detached magistrate; in an isolation cell with only the defendant and the physician present; under circumstances that were sensitive to the defendant's privacy interests; and involved no risk to the defendant's health, fourth amendment concerns as to the inherently intrusive nature of an examination to determine one's sex were fully met, and no grounds existed warranting suppression of the results of Dr. Turner's examination of the defendant's body.
 
 
 39
 In United States v. Dionisio, supra, the court said: More recently, in Schmerber v. California, 384 U.S. 757, 16 L.Ed.2d 908, 86 S.Ct. 1826 we relied on Holt, and noted that:
 
 
 40
 "Both federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." Id., at 764, 16 LEd2d 908 (footnote omitted).
 
 
 41
 Id. at 410 U.S. 6.
 
 
 42
 No communications or testimony, and rather only real or physical evidence, was compelled--if indeed it can be said that anything was compelled--from the defendant by Dr. Turner's examination of him in his cell to determine his sex.
 
 
 43
 (d) Neither the Magistrate nor the district court made any ruling upon the defendant's motion to suppress the ID card in the name of Sharon Cornelius, having overstamped thereon "no check cashing privileges," that CID Agent Mullens seized from the defendant's apartment on July 25, 1989. However, no error can be ascribed to that circumstance, because that ID card was never offered or admitted into evidence at the defendant's trial.
 
 
 44
 For the foregoing reasons the district court committed no error by overruling the defendant's motion to suppress.
 
 Evidence at the Trial
 
 45
 Most of the defendant's grounds of error discussed below concern evidentiary and other rulings made by the district court during his trial. He did not testify at his trial; however, a transcript of testimony given by him at the Army's court martial of Louis Norman Cornelius (court martial testimony) was admitted into evidence at his trial. The evidence at his trial which is deemed relevant to an understanding of the case and the grounds of error dealt with below is summarized as follows:
 
 
 46
 It was the opinion of Dr. Mullens, who examined the defendant in October, 1989, that defendant was phenotypically a male, that is, his visual inspection of the defendant's person showed him to be a male, but that his genotypic sex could only be proven by chromosomal analysis.[13]
 
 
 47
 When clean shaven[14] and dressed in female attire, the defendant was sufficiently androgynous, at least in manner, voice and appearance, to be able quite successfully to pass himself off as a female, and he did so.
 
 
 48
 Posing as a female and using different names, except in his two marriages with Louis Norman Cornelius in which he used the same one, he entered into formal marriages with other males as follows: In the name of Salviano Alamo Williams he was married to James Ervin Ferguson on July, 1984; in that of Silviania Elema Williams to Charles John Davis on March 1, 1985; in that of Sharon Sharitia Lovett to Louis Norman Cornelius on August 22, 1985, and a second time on September 9, 1985; in that of Gloria Ann Jones to Micah Anthony Lockett on March 23, 1989; in that of Sharon Lovett Williams to Richard Delton Douglas on December 24, 1989; and in that of Sharon Shaynita Williams to Curtis Lee Williams on July 24, 1990. All of those marriages were celebrated in Dillon or Marlboro Counties, South Carolina. The only one of those marriages that had been dissolved was the one to James Ervin Ferguson, the defendant having testified at the court martial that he was divorced from Ferguson in December of 1984 or 1985.
 
 
 49
 In 1986, the defendant and Louis Norman Cornelius submitted to the Army one of the certificates of their two marriages, and represented to the Army that they were husband and wife, as a result of which the United States paid, in respect to the defendant as the wife of Cornelius, BAQ benefits[15] amounting to between $4,235.23 and $5,195.23 from October 1, 1985 through the first three months of 1989, and caused to be issued to the defendant, as such wife, a military ID Card entitling him to, and he did, avail himself of the privilege of making purchases and negotiating checks at the Fort Bragg PX. None of those BAQ payments would have been paid in respect to the defendant, nor would that military ID card have been issued to him, had the Army been aware that he and Cornelius were not lawfully married.
 
 
 50
 The defendant had a joint checking account in the names of "SSG Louis N. Cornelius [and] Sharon L. Cornelius" at the United National Bank upon which the checks respectively identified in Counts Four through Ten were drawn and also had a checking account in the name of "Hon. Sharon L. Cornelius" at the Mid-South Bank and Trust Company, upon which those identified in Counts Eleven through Fifteen were drawn.
 
 
 51
 When the defendant drew and issued those checks, he knew there to have been insufficient funds or credits in those accounts for those banks to have honored and paid those checks. All of those checks were negotiated at the Fort Bragg PX by either the defendant himself or by unwitting soldiers whom the defendant procured to endorse and cash them there and to deliver the proceeds thereof to defendant, who sometimes represented to those soldiers that he was a judge. When those checks cashed by soldiers were dishonored by those banks and returned to that PX, those soldiers were held personally liable to pay to the PX the amounts thereof.
 
 II.
 
 52
 Defendant asserts that the trial court erred by overruling his motions for judgment of acquittal on Counts One, Two and Sixteen.
 
 
 53
 As to Count One, defendant argues that essential to his conviction of Count One was proof of its allegation that no legal marriage existed between him and his co-conspirator, Cornelius, and that since each of his marriages to Cornelius was celebrated in South Carolina, the law of which does not proscribe marriages between persons of the same sex, citing South Carolina Code § 21-1-10,[16] both of those marriages were lawful ones, wherefore the government failed to prove the marriage alleged therein to have been an unlawful one and on that ground his conviction on Count One must be reversed.
 
 
 54
 The government concedes that no South Carolina statute proscribes marriages between persons of the same sex, but contends that such marriages are illegal there as being against the public policy of South Carolina, and that even if neither of the two South Carolina marriages between the defendant and Cornelius was illegal on public policy grounds, both of those marriages were bigamous and void under the law of South Carolina, because defendant's marriage to Charles James Davis on March 1, 1985, had never been dissolved by divorce or otherwise.
 
 
 55
 Insofar as this court has been able to discover, marriages between persons of the same sex have been held to be illegal on grounds of public policy in all of the United States before whose courts the validity thereof has been in issue, see Annot. 63 A.L.R.3d 1199, and while that issue has not been decided by the highest court of South Carolina, this court is confident that it would so hold should that issue be presented to it.
 
 
 56
 Moreover, South Carolina Code § 20-1-80, provides in pertinent part that "[a]ll marriages contracted while either of the parties has a former wife or husband living shall be void." Accordingly, since the defendant's prior marriage to Davis had not been dissolved at the time either of his marriages to Cornelius was contracted, each of them, being bigamous ones, was void and illegal. South Carolina Dept. of Soc. Serv. v. Thomas, 262 S.E.2d 415, 416 (S.C.1980) (a party to a marriage is without legal capacity to contract a valid marriage to another person until that marriage is dissolved). The court committed no error by overruling the defendant's motion for judgment of acquittal as to Count One.
 
 
 57
 As to Counts Two and Sixteen, the defendant contends that each of them charges the crime of larceny of the property of the United States, an essential element of which is a trespassory taking, and that since the evidence failed to establish such a taking by the defendant, and merely established as to each of them that he fraudulently induced the United States voluntarily to part with its property,[17] the larceny charged in each of them was not proved, wherefore the trial court erred by overruling his motions for a judgment of acquittal as to each of those counts, citing Bennett v. United States, 399 F.2d 740 (9th Cir.1968).
 
 
 58
 In Bennett the court construed 18 U.S.C. § 2113(b), which provided that "[w]hoever takes and carries away, with intent to steal or purloin" (emphasis supplied) any property of any bank therein described, shall be guilty of a crime, and held that the phrase "steal and purloin" described larceny, to consummate which there must have been a taking "without the consent of the owner," which was trespassory in nature, Id. at 743, and that Bennett's acts constituted "the taking of property by false pretenses, but not 'by taking and carrying away with intent to steal or purloin,' i.e., not by common law larceny, a 'trespassory taking,' " Id. at 744, and reversed Bennett's conviction.
 
 
 59
 It is significant here that the pertinent language of 18 U.S.C. § 641, which the defendant was charged to have violated in Counts Two and Sixteen, providing that "[w]hoever embezzles, steals, purloins or knowingly converts to his own use or the use of another" any money, etc., critically differs from the language of 18 U.S.C. § 2113(b), construed in Bennett, in that the phrase "takes and carries away with intent to steal," appearing in 18 U.S.C. § 2113(b), and which is historically and classically descriptive of the crime of larceny, does not appear in 18 U.S.C. § 641.
 
 
 60
 In Boone v. United States, 235 F.2d 939 (4th Cir.1956), the defendant had transported a vehicle across state lines after purchasing it with a check he represented to be good but knew to be worthless, and was convicted of violating 18 U.S.C. § 2312, which provided that "[w]hoever transports in interstate ... commerce a motor vehicle ... knowing the same to have been stolen shall be ..." (emphasis supplied) guilty of a crime, and contended his conviction to be error because a "stolen" car was one taken through larceny only. The court affirmed the conviction, reasoning that "while 'stolen' is constantly identified with larceny, the term was never at common law equated or exclusively dedicated to larceny.... Nor in law is 'steal' or 'stolen' a word of art," Id. at 940, and said that regardless of what significance the common law, the courts, or the lexicologists have ascribed to "stolen", decisive here is the meaning that the Congress attributed to it. Id. at 940-41.[18]
 
 
 61
 In Morisette v. United States, 342 U.S. 246, 271-72 (1952), the Court explained as follows the meaning Congress attributed to the language in 18 U.S.C. § 641:
 
 
 62
 It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches....
 
 
 63
 The purpose which we here attribute to Congress parallels that of codifiers of common law in England and in the States and demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses....
 
 
 64
 (footnotes omitted).
 
 
 65
 It is thus clear that it was the purpose of Congress, in enacting 18 U.S.C. § 641, that the provisions thereof comprehend the larceny-type offenses charged in each of Counts Two and Sixteen here, wherefore the defendant's contention that the trial court erred by overruling his motion for judgment of acquittal on those counts is without merit.
 
 III.
 
 66
 The defendant next contends that his convictions of Counts Four through Fifteen, each of which charges a violation of North Carolina Statute § 14-107 (hereafter, § 14-107),[19] as assimilated by the Assimilative Crimes Act, 18 U.S.C. § 13, should be reversed, because 18 U.S.C. § 13 assimilated the state substantive law of § 14-107 and its punishment, citing United States v. Price, 812 F.2d 174 (4th Cir.1987), and that each of those counts is fatally defective and should be dismissed because each of them failed to allege that, at the time the checks identified therein were written, the defendant knew there was not sufficient funds on deposit in or credit with the banks upon which they were respectively drawn with which to pay those checks "upon presentation," citing State v. Edwards, 130 S.E. 10 (N.C.1925), wherefore the trial court erred by overruling his motion for judgment of acquittal on those counts.
 
 
 67
 Countering, the government asserts that since all those counts allege, as they in fact do, that the checks involved therein were drawn by the defendant "without having sufficient funds or credit with the said bank to be paid, and then well knowing that there were insufficient funds or credit available for payment ...," each of them sufficiently charges the offense comprehended by § 14-107.
 
 
 68
 It is true, as defendant asserts, that each of those counts fails to allege the words "upon presentation" at any place therein, and the issue raised as to those counts is whether that failure rendered them fatally defective.
 
 
 69
 In State v. Edwards, supra, the court affirmed the trial court's dismissal of a count because it alleged only that the drawer of the check involved had insufficient funds "on deposit," and failed also to allege that he had insufficient "credits with," the bank on which the check was drawn, and in so doing stated that
 
 
 70
 Where a statutory offense is charged, the indictment should set forth all the essential requisites prescribed by the statute, and no element should be left to inference or implication.
 
 
 71
 Id. at 11.
 
 
 72
 In State v. Cook, 158 S.E.2d 820, 822 (N.C.1968), the court said
 
 
 73
 A warrant or indictment following substantially the language of the statute is sufficient if and when it thereby charges the essentials of the offense 'in a plain, intelligible, and explicit manner'. GS 15-153; State v. Eason, 242 N.C. 59, 86 S.E.2d 774.
 
 
 74
 While the Assimilative Crimes Act assimilates state "substantive law pertaining to the elements of an offense and its punishment ... [i]t does not generally adopt state procedures or rules of evidence." (emphasis supplied). United States v. Price, 812 F.2d 174, 175 (4th Cir.1987); Kay v. United States, 255 F.2d 476, 479 (4th Cir.), cert. denied, 358 U.S. 825 (1958). In United States v. Fesler, 781 F.2d 384, 392 (5th Cir.), rehearing denied 783 F.2d 1063 (5th Cir.), cert. denied 476 U.S. 1118 (1986), the court stated that "[f]ederal law, not state law, determines the sufficiency of an indictment under the ... [Assimilative Crimes Act]."
 
 
 75
 In United States v. Hooker, 841 F.2d 1225, 1227 (4th Cir.1988), the court pointed out that
 
 
 76
 In Russell v. United States, 369 U.S. 749, 763-64, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962), the Court stated two of the criteria by which the sufficiency of an indictment under the Fifth and Sixth Amendments may be measured: These criteria are, first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,' " and, secondly, " 'in the case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' "
 
 
 77
 Counts Four through Fifteen charge that the defendant wrote and delivered to another the checks involved, therein respectively identified by date and check number, drawn on The United National Bank (as to Counts Four through Ten) and Mid South Bank (as to Counts Eleven through Fifteen), and on specified account numbers of his in those respective banks, "without having sufficient funds or credit with said bank[s] for the check[s] to be paid, and then well knowing that there were insufficient funds or credit available for payment, in violation of North Carolina General Statute 14-107, assimilated by Title 18, United States Code, Section 13." The failure of those counts also to allege the words "upon presentation" did not render those counts fatally defective. In the first place, those allegations substantially and substantively complied with the language of § 14-107, in that they allege that the checks were written and delivered without there having been sufficient funds or credit with said banks for the checks to be paid, and that the defendant knew such to be true. Second, under the provisions of § 14-107, the crime proscribed thereby is complete upon the drawer's drawing and delivering to another a check on a bank for the payment of money, knowing at the time of his doing so that he does not have sufficient funds on deposit in or credit with such bank for the check to be paid by it, and such is true regardless of whether that check is ever presented to that bank for payment. And third, the allegations thereof satisfy the criteria set forth in Russell v. United States, supra, in that, first, they allege, in substance, the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet, and second, given the specificity with which each of the several checks involved in those counts are identified by date, check number, amount and the identity of the drawer and drawee thereof, should the defendant later be charged in any proceedings with any of the offenses charged in those counts, the record of his convictions therein could, without any doubt whatever, be pleaded by him in defense of any such other charge.
 
 
 78
 While the defendant contends to the contrary, the government's evidence did establish that at the times the defendant drew and delivered the checks involved in those counts, he had insufficient funds on deposit in or credit with those banks upon which such of those checks were drawn for them respectively to pay those checks, wherefore such contention is without merit.
 
 
 79
 Thus, the allegations in Counts Four through Fifteen were not defective as the defendant asserts, and the trial court committed no error by denying his motions for judgment for acquittal on those counts.
 
 IV.
 
 80
 The defendant next assigns as errors the trial court's admitting into evidence over his objections a series of documents respectively marked Government's Exhibits 1 through 21 (hereafter, "Exhibit(s) __"), prior to the receipt of any testimony as to their authentication, identification or relevancy, all of them having been offered pursuant to Rule 104(b), Federal Rules of Evidence (FRE), which provides that
 
 
 81
 When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
 
 
 82
 The defendant objected to the admission of Exhibit 1, his birth certificate, and to Exhibits 2 through 8, certificates of his marriage to different males, on the ground that the government had not supplied evidence to establish that the names contained in those documents were those of the defendant, which amounted to an objection on the grounds of relevancy. All of those documents were copies of public records and bore the seal and certificate of the public custodian thereof, and, if relevant, were admissible pursuant to Rule 902(1), FRE, which provides in part
 
 
 83
 Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to ...
 
 
 84
 (1) A document bearing a seal purporting to be that of ... any State ... or ... political subdivision ... thereof, and a signature purporting to be an attestation or execution.
 
 
 85
 The transcript of defendant's court martial testimony was admitted into evidence as Exhibit 9, and if it was properly admitted, then the contents thereof satisfied the relevancy requirement for the admission of Exhibits 1 through 8, because in that Exhibit 9 the defendant testified to facts concerning his birth and those marriages that were substantially consistent with the same facts contained in those Exhibits 1 through 8. Exhibit 9 was relevant and was offered against the defendant, who made no objection to any specific portion thereof, he having merely made a blanket "objection" thereto. It was thus not hearsay, pursuant to Rule 801(d)(2)(A), FRE, which provides that a statement is not hearsay if it is "offered against a party and is ... the party's own statement in ... an individual ... capacity." Accordingly, all of those Exhibits 1 through 9 were properly admitted into evidence by the trial court.
 
 
 86
 Exhibit 10 was a certified copy of the pay, leave and earnings statements of Staff Sergeant Cornelius for the period from September 1, 1986 through May 1, 1989, during which the indictment alleged the violations therein charged to have been committed. These records were relevant to establish the BAQ payments made by the United States in respect to the defendant as the "wife" of Cornelius, and to prove the conspiracy charged in Count One and the substantive offense charged in Count Two. The defendant contends the trial court erred by admitting these records into evidence, arguing they are not public records. Those records were certified by the custodian thereof, and contrary to defendant's contention, they were public records and were properly admitted into evidence pursuant to Rule 901(b)(7), FRE.[20] See 5 Weinstein's Evidence Para. 901(b)(7) (1990); Bury v. Marietta Dodge, 692 F.2d 1335, 1337-38 (11th Cir.1982). Such military records were admissible in evidence long before the advent of the Federal Rules of Evidence, see O'Brien v. United States, 192 F.2d 948, 950 (8th Cir.1951) (personnel records); Sprencel v. United States, 47 F.2d 501, 507 (5th Cir.1931) (medical records).
 
 
 87
 Exhibits 11 through 14 were United States Army Pay Tables, effective January 1, 1985, 1987, 1988 and 1989, and were relevant to prove the BAQ benefits in issue. They were properly admitted by the trial court pursuant to Rule 902(5), FRE, which provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to ... (5) [b]ooks, pamphlets, or other publications purporting to be issued by public authority."
 
 
 88
 Exhibit 15, 16 and 17 were respectively certified copies of Cornelius' Servicemen's Group Life Insurance Election, a writing designating relatives who were to be notified should he become a casualty, both listing the defendant to be his wife and both signed by, and an Application for a Uniformed Services Identification Card signed by, him at Fort Bragg and also signed by the defendant acknowledging the receipt of such a card, all of which were relevant to establish that the defendant was represented to the authorities of the United States to be the wife of Cornelius, and all were properly authentic public records pursuant to Rule 901(a) and (b)(7), supra, and were thus properly admitted into evidence.
 
 
 89
 Exhibit 19, a Department of Defense Military Pay and Allowances Entitlements Manual, was relevant on the BAQ benefits issue, authenticated pursuant to Rule 901(a) and (b)(7), supra, and thus properly admitted.
 
 
 90
 Exhibits 20 and 21 respectively were copies of Chapter 51 of the North Carolina Code and Chapter 20-1-10 of the South Carolina Code, both relating to "Marriage," both offered for identification and admitted over the defendant's general "objection," which was not a sufficient objection upon which error may be predicated pursuant to Rule 103(a)(1), FRE, which provides
 
 
 91
 Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and
 
 
 92
 (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.].
 
 
 93
 The admission of Exhibits 20 and 21 did not affect a substantial right of the defendant and moreover the defendant failed to make a specific ground of objection thereto when no specific ground was apparent from the context. Those exhibits were most likely admitted for the court's convenience so it would have copies of the statutes appearing thereon ready to hand if needed. Such error, if any, which may have resulted from their admission was harmless.
 
 
 94
 Since the defendant asserted elsewhere in his brief that "[t]he court admitted over the objection of the defendant government's exhibits one through twenty-four without testimony or other evidence as to the relevant (sic) or authentication," and thereby implied that the court erred in doing so, this court will deal with the propriety of the court's admission of Exhibits 22 through 24 as follows:
 
 
 95
 Exhibit 22 is the written report of Dr. Mullens, who examined the defendant in October 1989. Dr. Mullens apparently testified at the trial, since in final argument counsel for the government stated that he did so and the defendant states in his brief that he did so. However, Dr. Mullens' testimony is not included as a part of the record before this court, nor does any part of the record indicate at what point during the trial Exhibit 22 was offered and admitted into evidence, or that the defendant made any objection thereto or assigned any specific ground for any such objection. Accordingly, any error asserted by reason of the admission of Exhibit 22 is not before the court here. Moreover, if the court committed error by admitting Exhibit 22, it was doubtless a harmless one.
 
 
 96
 Exhibit 23 was original photographs of the defendant taken in the Cumberland County, North Carolina Jail at Fayetteville on June 1, 1989, when the defendant was committed thereto upon his extradition from Anniston, Alabama. There was testimony that the photographs accurately depicted the defendant's appearance at that jail. They depicted him to be bearded and were thus relevant to the issue of his sex, were shown to have been records from the public office where they were kept and were properly admitted into evidence pursuant to Rule 901(b)(7), FRE, supra.
 
 
 97
 Exhibit 24 was a copy of the check identified in Count Fifteen of the indictment and was relevant to the issues raised by that count. The defendant asserts that the admission of that exhibit was error because there was no evidence to show that the defendant signed that check. Cindy L. Fisher testified that she talked to the defendant (at the Fort Bragg PX, or at least the court so assumes) when a soldier, Kevin R. Turner, was present and asked the defendant if he had written a check admitted as Exhibit 44, and that he responded that he had done so and admitted that it was not a good check. That Exhibit 44 was dated January 30, 1989, was written for $150, showed Kevin R. Turner as the payee, was drawn on the Mid-South Bank and Trust Company and on an account there in the name of "Hon. Sharon Cornelius," in which name it was signed by the drawer thereof. The defendant thus admitted to Cindy L. Fisher, according to her testimony, that he drew that check, Exhibit 44, by signing the name of Hon. Sharon Cornelius thereto, and that testimony operated to authenticate as genuine that specimen of the defendant's signature thereon. Rule 901(b)(3), FRE, provides that the authenticity of a document may be established by a "[c]omparison [of such document] by the trier of fact ... with specimens which have been authenticated." Such a comparison of the signatures appearing on Exhibits 24 and 44 shows almost to a certainty that the same person affixed the signatures appearing on each of those exhibits. It was thus proper for the court to admit Exhibit 24 into evidence for such a comparison to be made by the jury as the trier of the facts at the defendant's trial.[21]
 
 V.
 
 98
 Defendant asserts that the district court erred by admitting into evidence Exhibit 40, as well as some testimony pertaining thereto, and Exhibits 48 through 62. He argues here that that evidence included proof of wrongful acts of the defendant with which he was not charged in the indictment, and that the admission thereof was prohibited by the provisions of Rule 404(b), FRE.[22]
 
 
 99
 Ms. Scott, an employee of the Fort Bragg PX, testified that that PX kept a record of all "bad checks" that are cashed there and that Exhibit 40 is one such list. At the top center of that Exhibit 40 is printed "Louis Cornelius--Sharon Cornelius xgz-ip-auvaB Co 27th Engr, FDNC," below which appear eight separate columns titled, from left to right, the date of the listed check, the date it was returned from its drawee bank, the number of the check, the name of the drawee bank thereof, the amount of the check, the reason it was returned by the bank, the date it was paid by either the payee who cashed it at the PX or the drawer of the check and, in the last column on the right, name of the check's payee who cashed it at the PX, the unit to which he was assigned at Fort Bragg and his identifying number.
 
 
 100
 When Exhibit 40 was offered into evidence, the defendant's counsel objected to Ms. Scott's testifying that the persons whose names are listed in the extreme right-hand column were the persons who came into the PX and cashed the respective checks, assigning as the ground of that objection that Ms. Scott had "no personal knowledge of that." Thereupon Ms. Scott explained that those persons' signatures were on the backs of the checks, and that the PX sent a notice to each person, and his unit, who cashed a check at the PX and also sent a notice to the person, and his unit, who wrote the check, following which the court admitted Exhibit 40 into evidence.
 
 
 101
 On his appeal here, the defendant for the first time contends that the trial court erred in admitting Exhibit 40 because wrongful acts bad checks--with which the defendant had not been charged were listed thereon and the admission into evidence of those uncharged wrongful acts was proscribed by Rule 404(b), FRE, and constituted error.
 
 
 102
 Exhibit 40 had listed thereon the checks identified in Counts Four through Fifteen of the indictment, all of them being shown to have been returned to the PX by the banks on which they were drawn because of nonsufficient funds, wherefore that Exhibit 40 was relevant. Also listed thereon were twenty-three other checks, all of which were shown to have been returned by the banks upon which they were drawn because of nonsufficient funds, except that two of them were returned because the account upon which they were drawn had been closed, and one other of them was listed thereon because of "Bank Error." The record does not show that any of those twenty-three checks was ever mentioned in the testimony of any witness.
 
 
 103
 Exhibit 40, being relevant, was admissible into evidence pursuant to Rule 803(6), FRE.[23] Defendant's counsel neither requested the court to excise from the exhibit before admitting it the bad checks listed thereon that were not charged in the indictment nor moved for a limiting instruction pursuant to Rule 105, FRE.[24] Indeed, at the time the defendant objected to the admission of the exhibit in the trial court, he did not state the specific ground of his objection to the admission thereof that he asserts here as ground for claiming the trial court erred by admitting the exhibit, and the specific ground he asserts here was not then apparent from the context, wherefore pursuant to Rule 103(1), FRE, supra, he may not now assign as ground of error the ground he asserts here. Even if the defendant had objected at the trial on the ground he asserts here, the exhibit likely would still have been admitted. See United States v. Masters, 622 F.2d 83, 85-86 (4th Cir.1980); United States v. Teague, 737 F.2d 378, 381 (4th Cir.1984), cert. denied, 469 U.S. 1161 (1985); United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir.), cert. denied, 464 U.S. 837 (1983).
 
 
 104
 Exhibits 48 through 62 were copies of "bad check notifications" that the Fort Bragg PX mailed to the defendant, as the drawer of the checks involved in the indictment, and to the payees named on those checks who cashed them at that PX, and receipts issued to some of those payees who had paid to the PX the amounts of some of those bad checks. They were all relevant to the issues and admissible as records of the PX's regularly conducted business activity pursuant to Rule 803(6), FRE, supra.
 
 
 105
 The trial court did not err by admitting into evidence any of Exhibits 40 and 48 through 62.
 
 VI.
 
 106
 The defendant asserts as error the trial court's overruling his motion to dismiss either one or the other of Counts Two and Sixteen on the ground that they are multiplicitous in that each of them charges a separate violation of 18 U.S.C. § 641 when, the defendant asserts, the evidence shows only one violation thereof to have been proved. Countering, the government asserts that Count Two charges that the violations therein identified were committed during the period between September 1, 1985 and June 30, 1989, and that those violations consisted of the substantive offense of the larceny of government property based upon the overt acts of the conspiracy charged in Count One, while Count Sixteen alleges that the larceny therein charged occurred between January 8 and January 27, 1989, which period postdated by several months the period during which the violations charged in Count Two were alleged to have been committed, and represents a separate charge of the "larceny" of government property resulting from the passing at the Fort Bragg PX of the worthless checks identified in Counts Eleven through Fifteen, all of which were dated during the period charged in Count Sixteen.
 
 
 107
 The overt acts of the conspiracy charged in Count One, which were the criminal acts of the defendant that constituted the violation charged in Count Two, on the one hand, and the criminal acts of the defendant that constituted the violation charged in Count Sixteen, on the other, were separate acts and violations, committed during separate periods of time, and constituted altogether separate violations of 18 U.S.C. § 641. Accordingly, Counts Two and Sixteen were not fatally multiplicitous.
 
 VII.
 
 108
 Finally the defendant assigns as error the trial court's overruling of his objections to what he asserts to have been improper remarks made by government counsel during closing argument and the trial court's admonishing defendant's counsel not to object to those improper remarks.
 
 
 109
 The record reflects that the defendant's counsel repeatedly objected during the government's counsel's closing argument without any valid basis for such objections, as a result of which the trial judge called a bench conference and, presumably out of the hearing of the jury, explained to the defendant's counsel that the remarks made by government's counsel to which defendant's counsel had objected were not objectionable, that it was improper for defendant's counsel without valid reason repeatedly to interrupt government counsel's argument, and that defendant's counsel would be permitted to argue contrary to that which the government's counsel had argued, etc., the trial court's remarks being far more didactic and instructive than critical in character.
 
 
 110
 The remarks of government's counsel to which defendant's counsel objected were not objectionable and the remarks of the trial judge to the parties' counsel at the bench conference were not improper. Accordingly no error resulted from any of them.
 
 
 111
 We hold the convictions of the defendant to be free of error.
 
 
 112
 AFFIRMED.
 
 
 
 [1]
 At the close of the government's evidence in chief, the trial court granted defendant's motion for judgment of acquittal as to Count Three
 
 
 [2]
 There was adequate evidence to support the Magistrate's findings of fact by a preponderance of the evidence. At a suppression hearing involving the issue of whether evidence against the accused has been obtained unconstitutionally, the prosecution has no greater burden of proof than that of a preponderance of the evidence. United States v. Matlock, 415 U.S. 164 (1974) United States v. Breit, 712 F.2d 81, 83 (4th Cir.1983); United States v. Helms, 703 F.2d 759, 763-64 (4th Cir.1983)
 
 
 [3]
 Robertson testified that Hawk had later told him that when Hawk and the defendant were undressing on their wedding night, Hawk discovered that the defendant had male genitalia, that the two of them had had a "fuss" and that the defendant had assaulted him as he was leaving the defendant's apartment
 
 
 [4]
 Robertson did talk with Hawk some time on May 23, it being unclear from the record the time at which he did so
 
 
 [5]
 In his testimony, the defendant denied having so stated to Robertson
 
 
 [6]
 The defendant first testified that he got papers identifying himself from his purse and handed them to Robertson. He later testified that he did not identify himself to anyone at the Police Station on May 23
 
 
 [7]
 National Crime Identification Center
 
 
 [8]
 Robertson's written arrest record reflected that the defendant was arrested by him at the Anniston Police Station at 12:30 P.M. on May 23
 
 
 [9]
 The defendant testified that he was detained from the time he arrived at the Police Station on May 23, but he testified to no facts to support that testimony. He also testified that his requests to be permitted to contact a lawyer were ignored
 
 
 [10]
 Robertson so testified. CID Agent Belcher also testified that Mrs. Trushka told him later that she requested the Anniston Police to remove the box from her home on May 23. The defendant testified that after he arrived at the Police Station on May 23, Robertson telephoned Mrs. Trushka and asked her for the box, then went to her home and got it from her, returned to the Police Station with it and removed some papers from it, ran those papers through NCIC discovered from doing so that the defendant was wanted on the North Carolina warrants and thereupon arrested him at about 2:30 P.M., on May 23
 
 
 [11]
 The defendant testified that Dr. Turner merely questioned him and did not touch him in the course of that examination
 
 
 [12]
 The Magistrate also concluded that the computer identification check conducted by the Anniston police on May 23 to determine the defendant's identity and criminal history, which revealed that the defendant was wanted on the warrants issued in North Carolina, comported with "good police procedure," and involved no constitutionally impermissible conduct by the police
 
 
 [13]
 Such a chromosomal analysis was never made
 
 
 [14]
 Photographs of the defendant, taken on June 1, 1989, upon his admission to the Cumberland County Jail at Fayetteville, North Carolina, after having been extradited there from Anniston, showed him to be bearded
 
 
 [15]
 BAQ benefits are monetary allowances paid by the United States to members of its Armed Forces in respect to wives and other dependents of such members and are paid in addition to the other emoluments to which such members are entitled
 
 
 [16]
 In the first paragraph thereof, South Carolina Code § 20-1-10, provides:
 All persons, except mentally incompetent persons, and persons whose marriage is prohibited by this section, may lawfully contract matrimony.
 Its remaining provisions merely proscribe marriages between persons who bear to each other specified degrees of kinship by consanguinity or affinity.
 
 
 [17]
 The evidence presented by the government to prove the charge in Count Two was the fraudulent furnishing to the Army authorities the illegal marriage certificate by the defendant and Cornelius and their representing themselves to be husband and wife, thereby causing the United States to pay the BAQ payments that it otherwise would not have paid, and that presented to prove the charge in Count Sixteen was defendant's drawing the worthless checks identified in Counts Eleven through Fifteen and cashing them or causing them to be cashed at the Fort Bragg PX
 
 
 [18]
 In United States v. Turley, 352 U.S. 407 (1957), the Court quoted from Boone at some length and construed 18 U.S.C. § 2312 in the same manner as did this court in Boone
 
 
 [19]
 North Carolina Statute § 14-107 provides in pertinent part:
 It shall be unlawful for any person ... to draw, make, utter or issue and deliver to another, any check or draft on any bank or depository, for the payment of money or its equivalent, knowing at the time of the making, drawing, uttering, issuing and delivering such check or draft as aforesaid, that the maker or drawer thereof has not sufficient funds on deposit in or credit with such bank or depository with which to pay the same upon presentation.
 
 
 [20]
 Rule 901(a) and (b)(7), FRE, provide in part:
 (a) The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
 (b) By way of illustration ... the following are examples of authentication or identification conforming with the requirements of this rule:
 * * *
 (7) Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.
 
 
 [21]
 The same equally applies to Exhibits 25 through 35, those being the checks identified in Counts Four through Fourteen of the superceding indictment, the signatures on each of which exhibits appear, when compared with that on Exhibit 44, almost certainly to have been affixed by the same person
 
 
 [22]
 Rule 404(b), provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [23]
 Rule 803(6), FRE, provides:
 The following are not excluded by the hearsay rule even though the declarant is available as a witness:
 (6) A memorandum, report, record, or data compilation, in any form of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 
 
 [24]
 Rule 105, FRE provides:
 When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.